# EXHIBIT B

AO 106 (Rev. 04/10) Application for a Search Warrant

**Sealed**

Public and unofficial staff access to this instrument are prohibited by court order.

## UNITED STATES DISTRICT COURT
for the
Southern District of Texas

United States Courts
Southern District of Texas
**FILED**
NOV 1 4 2017

David J. Bradley, Clerk of Court

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

CC Pharmacy
2656 South Loop West Suite 395
Houston, Texas 77054

Case No.  **H17-1719**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

CC Pharmacy, 2656 South Loop West Suite 395, Houston, Texas 77054

located in the _____ Southern _____ District of _____ Texas _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachments A and B to the Affidavit in Support of Search Warrant.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Distribution of Controlled Substances |
| 21 U.S.C. § 846 | Conspiracy to Distribute Controlled Substances |
| 21 U.S.C. § 856(a)(2) | Maintaining a Drug-Involved Premises |

The application is based on these facts:

See attached Affidavit of Special Agent Anthony Armour, US Drug Enforcement Administration.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Anthony Armour, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: November 14, 2017

_____
*Judge's signature*

City and state:  Houston, Texas

United States Magistrate Judge Frances H. Stacy
*Printed name and title*

## Attachment A

The premises known and described as CC Pharmacy (the "SUBJECT LOCATION") is located on the third floor of a multi-story office building located at 2656 South Loop West Suite 395, Houston, TX 77054. CC Pharmacy is situated on the north side of the office building with a wooden door that displays "395, CC Pharmacy, Monday - Friday, 8:00am – 4:00pm" sign in black letters.





Page 1 of 1

## ATTACHMENT B

### ITEMS TO BE SEIZED FROM PREMISES

The items to be seized are the following, which constitute evidence, fruits, and instrumentalities of violations of Title 21 United States Code, Sections 841(a)(1) (unlawful distribution of controlled substances); 846 (conspiracy to unlawfully distribute controlled substances); and 856 (a)(2) (maintaining a drug-involved premises) dated from 2016 to the present:

1. Documents constituting, concerning, or relating to patient files and related clinic, pharmacy, or other medical records; electronic patient files, scheduling documentation, prescription pads, patient sign in sheets, daily dispensing logs, daily logs, any forms signed by patients, patient testing orders and testing reports used or obtained in patient care, appointment notes, procedure notes, physicians' orders, communication notes, assessments, insurance pre-certifications, follow-up assessments, discharge assessments, other patient assessments, medication profiles, consent forms, office compliance reviews, clinical records reviews, clinical or pharmaceutical licenses and certifications, correspondences, patient progress notes, and patient visit logs/sign-in sheets.

2. Any invoices, order forms, credit memos, or any other documents related to the purchase, return or dispensation of controlled substances.

3. Any prescriptions, including pre-signed and blank prescriptions and prescriptions pads to include Schedule II prescriptions issued by the Texas Department of Public Safety or other entity empowered to do so.

4. Any executed DEA Forms 222, Order Forms, or other documents used in the purchase of Schedule II controlled substances.

5. Personnel and payroll files and records, such as employee lists, documents reflecting names, addresses, duration of employment, personnel files, pay schedules. Payroll records, work schedules, time sheets, appointment books, employees notes or summaries, and other records showing the services provided by and all payments made to or for nurses, nurse aids, physicians, physical therapists, and other persons providing health services.

6. Corporate and business records, articles of incorporation, resolutions, records regarding officers' duties and responsibilities, licensing records, property records, ownership, corporate structure, control and ownership.

7. U.S. currency, tax records, bills, billing records, cash receipt books, booking ledgers, investment or retirement account statements, safe deposit boxes, or other items evidencing the acquisition, secreting, transfer, storage, concealment, and/or expenditure of money, assets, wealth, or other items of value which are used, or

intended to be used, as the proceeds of, or to facilitate the illegal distribution of controlled substances.

8. Bank and brokerage account monthly statements, opening records, checks, wire transfers, check registers, cancelled checks, deposit tickets, and records of transfer.

9. Invoices, purchase orders, credit card information, wire transfers, payments, account statements, investment records and postal mailing records.

10. Calendars, appointment books, telephone message pads, day planners, logs, correspondence, rolodexes, personal digital assistants (PDAs), emails, and address books.

11. Foreign and/or domestic government issued passports and business records.

12. Any and all telephone records, personal diaries, written correspondence or emails to, from, or between the owners or employees.  Any correspondence, including transmissions by, text message, facsimile and stored e-mail, exchanged between or involving any of the clinic employees, agents, or representatives located in the clinic.

13. Any and all records showing or bearing indicia of the use, ownership, possession or control of the computer equipment, accessories, telephone(s), and modem(s).  Any and all tapes, cassettes, hardware, computer disks, data disks, magnetic media, floppy disks, CD ROM disks, mobile devices, smart phones, tape systems, optical data storage media, hard disks, thumb drives, network attached storage, cellular telephones, and other computer relationship operational equipment.

14. Any information described in the proceeding paragraphs stored in electronic or magnetic media, electronic data processing and storage devices, computers and computer systems, including central processing units, internal and peripheral diskettes, tape drives and tapes, optical storage devices such as CD/DVD/Blu-Ray, including the video/audio recordings recorded on the office's video/audio/security system, together with system documentation, operating logs and documentation, software and instruction manuals.

    a. Your Affiant knows that computer hardware, software, and electronic files may be important to a criminal investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data.  Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime, and/or fruits of the crime.  In the present case, your Affiant requests permission to search and seize records, including that which may be stored on

a computer. Your Affiant also requests permission to seize the computer hardware that may contain such records if it becomes necessary for reasons of practicality to remove the hardware and conduct a search off-site. Computer hardware is a container for evidence, was itself an instrumentality of the crime under investigation, and may be a container for contraband.

b. Based upon my training and experience and information related to your Affiant by agents and others involved in the forensic examination of computers, your Affiant knows that computer data can be stored on a variety of mobile devices, smart phones, systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes, thumb drives, memory chips, external hard drives, and cellular telephones. I also know that during the search of the premises, it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

    i. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

    ii. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

    iii. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.

    iv. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods,

including the use of innocuous or misleading filenames and extensions.  In additional, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

c.  In light of these concerns, your Affiant hereby requests the Court's permission to seize the computer hardware, the digital video recorder (DVR) (and associated peripherals and mobile devices) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware on-site for this evidence.

d.  The computer forensic examiner will attempt to create an electronic "image" of all computers that are likely to store the evidence described in the warrant.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Imaging a computer permits the agents to obtain a forensic copy of the computer's stored data without actually seizing the computer hardware.  The computer forensic examiner or another technical expert will then conduct an off-site search for the evidence described in the warrant from the image copy at a later date.

e.  If "imaging" proves impractical, or even impossible for technical reasons, then the agents will seize those components of the computer system that the computer forensic examiner believes must be seized to permit the agents to locate the evidence described in the warrant at an off-site location.  The components will be seized and taken into the custody of the agent.  If, after inspecting the computers, the analyst determines that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

f.  Searching the computer system for the evidence described above will require a range of computer forensic analysis techniques.  Criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to frustrate law enforcement searches for information.  In order to properly execute the search authorized by the warrant, specially trained agents or forensic analysts will be required to conduct a thorough forensic analysis of

the seized media, such as scanning areas of the disk not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, your Affiant requests permission to use whatever computer forensic analysis techniques appear necessary to locate and retrieve the above-described evidence.

15. All controlled substances in physical inventory or stock at the SUBJECT LOCATION, including but not limited to hydrocodone (schedule II), alprazolam (schedule IV), promethazine with codeine (schedule V), oxycodone (schedule II), and carisoprodol (schedule IV).

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Anthony Armour, being duly sworn upon my oath, state as follows:

### A. Affiant Background and Experience

1. I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"). I have been employed by DEA since February 2004 and have received specialized training from the DEA Training Academy in Quantico, Virginia, concerning violations of the Controlled Substances Act under Title 21 of the United States Code. At the DEA Training Academy, I completed several hundred hours of comprehensive, formalized instruction in such matters as narcotics identification, detection, trafficking and interdiction; money laundering techniques; and asset identification, seizure and forfeiture, and have received training in the conduct of narcotics enforcement and investigations.

2. As an SA with DEA, I have participated in numerous narcotics investigations along with other experienced SAs and law enforcement personnel. Among other things, these investigations involved: the unlawful importation, manufacture, possession with intent to distribute, and distribution of narcotics (including methamphetamine, cocaine, and heroin), the laundering of narcotics proceeds and monetary instruments derived from narcotics activities, and conspiracies associated with narcotics offenses. These investigations have involved debriefing defendants, witnesses, and informants, recruiting and directing informants, conducting surveillance and telephone toll analysis, applying for court orders authorizing wire interceptions, conducting wire intercept investigations, and applying for and executing state search warrants as well as executing federal search warrants. The

investigations have resulted in the seizure of narcotics and narcotics-related assets, and arrests for narcotics-related offenses.

3. Since March 2016, I have been assigned to the DEA's Houston Division Office, Tactical Diversion Squad ("TDS"). The TDS is a multi-agency task force that investigates the illegal trafficking of pharmaceutical controlled substances. The TDS is comprised of agents from the DEA, Homeland Security Investigations ("HSI"), and state and local law enforcement personnel assigned as Task Force Officers ("TFOs"). Through my experience with TDS, I have spoken with Pharmacists, Physicians, Diversion Investigators, Medical Board Investigators, Pharmacy Board Investigators, patients and other witnesses having extensive knowledge of pharmaceuticals, regarding the methods and practices of individuals trafficking in or diverting pharmaceutical controlled substances.

4. During my time at TDS, I have become familiar with a developing trend in drug diversion based on previous investigations and from information developed from both confidential informants and citizen complaints. That trend is the development and operation of pain management clinics prescribing large quantities of controlled substances to individuals known to be diverting the controlled substances for illegitimate gain. I know from previous investigations, including conversations with individuals known to have procured such controlled substances, that the pain management clinics are prescribing large quantities of oxycodone and hydrocodone.

5. The facts set forth in this affidavit are based upon my personal observations, investigation, public source and business records, and information provided to me by persons who have knowledge of the facts. Because this affidavit is submitted for

the limited purpose of establishing probable cause for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation. I have set forth only the facts believed necessary to establish probable cause to believe that evidence of a crime, fruits of a crime, contraband, and other items illegally possessed in violation of federal laws, to include 21 U.S.C. § 841 (Distribution of Controlled Substances); 21 U.S.C. § 846 (Conspiracy to Distribute Controlled Substances), and 21 U.S.C. § 856(a)(2) (Maintaining a Drug-Involved Premises) are currently located at the **SUBJECT LOCATION** described below.

**B.  Purpose of the Affidavit**

6.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known and described as CC Pharmacy, LLC ("CC Pharmacy"), located at 2656 South Loop West, Suite 395, Houston, Texas 77054 (hereinafter, the "**SUBJECT LOCATION**"), more particularly described in the following paragraphs and in Attachment A, to seize evidence, instrumentalities, and fruits of the criminal conduct of Clint Carr ("Carr"), Dustin Curry ("Curry"), Hassan Barnes ("Barnes"), Adam Long ("Long"), Frasiel Hughey ("Hughey"), Darius Tyler ("Tyler") and others at the **SUBJECT LOCATION**.

7.  Based on my training, experience, and the facts as set forth in this Affidavit, I submit that there is probable cause to believe that Carr, Curry, Barnes, Long, Hughey, Tyler and others known and unknown to the investigation have committed violations of 21 U.S.C. § 841 (Distribution of Controlled Substances); 21 U.S.C. § 846 (Conspiracy to Distribute Controlled Substances), and 21 U.S.C. § 856(a)(2)

(Maintaining a Drug-Involved Premises). I also believe that there is probable cause to search the **SUBJECT LOCATION** for evidence, instrumentalities, and fruits of these crimes, as further described in Attachment B.

8. Specifically, the statements in this affidavit are based upon: (a) information that I learned during the investigation of CC Pharmacy; (b) oral and written reports about this and other investigations; (c) physical surveillance conducted by investigators in which I have participated or that were reported to me directly or indirectly; (d) public sources and business records; (e) information reported to me by other federal, state, and local law enforcement officers during the course of their official duties; (f) information from a confidential informant ("CI"), which was only relied upon once it had been deemed reliable through independent corroboration[1]; and (g) my experience and background as a an SA with DEA.

9. Because this affidavit is submitted for the limited purpose of securing authorization for a search and seizure warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested search warrant.

C. **Background on the Relevant Statutes and Regulations**

10. Title 21 U.S.C. § 841(a)(1) makes it an offense for any person to knowingly and intentionally distribute or dispense a controlled substance except as authorized by law, a crime often referred to as "diversion." Where such controlled substances are

---

[1] The CI provided information regarding the illegal distribution of narcotics at the subject location. I believe that the information that the CI has provided is credible with respect to the illegal activities at the subject location because it is generally consistent with other evidence that has been developed. Finally, the CI has an interest in cooperating.

distributed through a pharmacy, the government must prove that the individuals involved acted knowingly and intentionally and that they distributed controlled substances other than for a legitimate medical purpose and in the usual course of their professional practice. *United States v. Brown*, 553 F.3d 768, 781 (5th Cir. 2008).

11. Title 21 U.S.C. § 846 makes it an offense when two or more persons agree to commit a crime--here, unlawful distribution of a controlled substance--and each person enters the agreement knowing of at least one of its objects and intends to help accomplish it.

12. Title 21 U.S.C. § 812 establishes schedules for controlled substances that present the potential for abuse and the likelihood that abuse of the drug could lead to physical or psychological dependence on that drug. Such controlled substances are listed in Schedule I through Schedule V, depending on the level of potential for abuse; the current medical use; and the level of possible physical dependence. Controlled substance pharmaceuticals are listed as controlled substances, from Schedule II through Schedule V, because they are considered dangerous. There are other drugs that are available only by prescriptions but are not classified as controlled substances. Title 21 of the Code of Federal Regulations ("C.F.R."), Part 1308 provides further listings of scheduled drugs.

13. Pursuant to 21 U.S.C. § 822, controlled substances may only be prescribed, dispensed, or distributed by those persons who are registered with the Attorney General of the United States to do so (with some exceptions, such as delivery

persons). The authority to register persons has been delegated to the DEA by the Attorney General.

14. The Federal Register explains the requirements for a valid prescription. It provides that, for a prescription for a controlled substance to be effective, "[it] must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is on the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."[2]

15. Title 21 U.S.C. § 856(a)(2) makes it an offense to: manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.

16. Texas Health and Safety Code Section 481.074(a)(2) also states, "A pharmacist may not dispense a controlled substance if the pharmacist knows or should have

---

[2] Title 21 C.F.R. 1306.04.

known that the prescription was issued without a valid patient-practitioner relationship."

17. Federal law requires that certain records for controlled substance be kept for two years. Title 21 C.F.R. § 1304.04 sets forth the requirements for maintaining records and inventory. It states, in part: "every inventory and other records [i.e., prescriptions] required to be kept under this part must be kept by the registrant and be available, for at least 2 years from the date of such inventory or records, for inspection and copying by authorized employees of the [DEA]."

**D. Background on the Prescription Drugs Being Diverted**

18. Oxycodone is a generic name for a narcotic analgesic classified under federal law as a Schedule II narcotic controlled substance. Oxycodone is also known by its brand names, to include OxyContin®, Percocet® and Roxicodone®. Oxycodone, when legally prescribed for a legitimate medical purpose, is typically used for the relief of moderate to severe pain. Oxycodone is sometimes referred to as "synthetic heroin" or "hillbilly heroin," and the effects, addiction, and chemical composition of oxycodone are extremely similar to heroin. An oxycodone prescription is generally issued for a modest number of pills to be taken over a short period of time because of the potential for addiction.

19. OxyContin® is the brand name of a time-released formulation available in several strengths between 10 mg and 80 mg per tablet, designed to be absorbed into the system over the course of 10 to 12 hours. It was approved for use in 1996, and by 2001 was the largest grossing opiate pain reliever in the United States. In 2010, as a result of public pressure, OxyContin® was reformulated by the manufacturer to

make it more difficult to snort, smoke or otherwise abuse, and the markings on the pill were changed from "OC" to "OP" to differentiate the newer tamper-proof version.

20. Roxicodone® is an immediate-release formulation available in 5 mg, 15 mg, and 30 mg tablets. Because of the immediate-release component, the potential for overdose and death with Roxicodone® is exponentially higher than OxyContin®, even though the tablet is not as strong as OxyContin®. Oxycodone in either formulation is extremely addictive and is a commonly abused controlled substance that is diverted from legitimate medical channels. Because of their brand name, OxyContin® and Roxicodone® typically have a higher street value than their generic equivalents. Oxycodone's street value is typically $1 per milligram.

21. Hydrocodone is a generic name for a narcotic analgesic formerly classified under federal law as a Schedule III narcotic drug controlled substance. Since October 6, 2014, hydrocodone combination products have been classified under federal law as Schedule II narcotic drug controlled substances. Hydrocodone is found in medications known by the brand names Vicodin®, Norco®, and Lortab®. Hydrocodone, when legally prescribed for a legitimate medical purpose, is typically used for the relief of mild to moderate pain. Accordingly, the prescription is generally for a modest number of pills to be taken over a short period of time. Hydrocodone can be addictive and is a commonly abused controlled substance that is diverted from legitimate medical channels. Hydrocodone typically has a street value of $5 to $7 per 10 mg tablet.

E. Relevant Individuals and Entities

22. CC Pharmacy, 2656 South Loop West, Suite 395, Houston, Texas 77054 (i.e., the **SUBJECT LOCATION**) became registered with the DEA as a retail pharmacy on May 2, 2016, to handle Schedule II-V controlled substances under DEA Number FC5944699. The **SUBJECT LOCATION** is registered with the Texas State Board of Pharmacy with license number 30743. The **SUBJECT LOCATION** is a cash-based business and does not accept insurance.

23. Clint Carr (date of birth: ▮▮▮▮, Texas driver's license number ▮▮▮▮ ) is the owner of the **SUBJECT LOCATION** and the following CC Pharmacy locations, according to records obtained from the Texas Secretary of State:

    a.    CC Pharmacy, 8906 Wall St., Suite 305, Austin, Texas 78754 (hereinafter, "CC Pharmacy 2"), DEA #FC6354409; and

    b.    CC Pharmacy, 3000 Joe DiMaggio Blvd. #57, Round Rock, Texas 78665 (hereinafter, "CC Pharmacy 3"). DEA #FC6922783.

24. Dustin Curry (date of birth: ▮▮▮▮, Texas driver's license number ▮▮▮▮ ) Curry is the Operations Manager at the **SUBJECT LOCATION**, according to records obtained from the Texas Secretary of State.

25. Hassan Barnes (date of birth: ▮▮▮▮ is the Pharmacist-in-Charge at the **SUBJECT LOCATION** and his Texas Board of Pharmacy License number is 39585;

26. Adam Long (date of birth: ▮▮▮▮, Texas driver's license number ▮▮▮▮ ) is a pharmacy technician trainee at the **SUBJECT LOCATION** and his Texas Board of Pharmacy License number is 260175;

27. Frasiel Hughey (date of birth: ████████ Texas driver's license number ████████ is a Houston-based drug trafficker; and

28. Darius Tyler (date of birth: ████████, Texas driver's license number ████████) is a Houston-based drug courier.

## F. Probable Cause of Violations of Law

29. In March 2017, the Texas State Board of Pharmacy ("TSBP") conducted an inspection at CC Pharmacy 2, which is located in Austin, Texas. During the inspection, TSBP investigators observed no pharmacist present, no controlled substances on the premises, and no drug receiving records or prescription records on the premises. Subsequent to the inspection, investigators learned that the **SUBJECT LOCATION** was operating and distributing controlled substances in Houston, Texas.

30. Since March 2017, DEA personnel in Houston and Austin have investigated Carr, Curry, Barnes, Long, Hughey, Tyler and others at the **SUBJECT LOCATION**, regarding the illegal distribution of Scheduled II controlled substances, namely oxycodone, hydrocodone, and other drugs in Houston, Harris County, Texas.

31. DEA Investigators have learned from DEA registered pharmaceutical distributors and DEA databases that the **SUBJECT LOCATION** orders extremely large amounts of controlled substances, primarily oxycodone and hydrocodone. Once the controlled substances arrive via FedEx or UPS, Carr, Curry or Long will sign for and accept the packages of controlled substances.

32. Based on surveillances, seizures of controlled substances and CI information, there is probable cause to believe that Long and Curry sell and distribute the controlled substances to members of Houston-based drug trafficking organizations.

33. On July 26, 2017, investigators established surveillance at the **SUBJECT LOCATION** (again, the Houston-based CC Pharmacy) and observed Witness 1 enter with a backpack and exit a short time later. Investigators followed Witness 1 in their vehicle as they drove around the area and returned to the **SUBJECT LOCATION** approximately ten minutes later. Investigators, along with a Houston Police Department ("HPD") marked patrol unit, followed Witness 1 once they departed. After observing a failure to signal traffic violation, Witness 1 was stopped by HPD officers. According to HPD officers, Witness 1 appeared nervous and admitted to driving without a license. Officers detected the odor of marijuana and Witness 1 informed the officers that others had been smoking marijuana inside Witness 1's vehicle.

34. Thereafter, HPD officers searched the vehicle and located a backpack that contained three bottles of oxycodone containing approximately 360 tablets and 17 bottles of hydrocodone containing approximately 2,040 tablets. Hassan Barnes, the Pharmacist-in-Charge at the **SUBJECT LOCATION,** was the pharmacist listed on each bottle. The bag also contained an invoice that appeared to be from the **SUBJECT LOCATION** and indicated that Witness 1 purchased the controlled substances for $8,400.00 from the **SUBJECT LOCATION**. In addition, Witness 1's bag contained a receipt issued by Adam Long, the pharmacist technician at the **SUBJECT LOCATION,** which contained various patient names. Finally, Witness

1 possessed numerous completed but unsigned prescriptions in the names of various patients from Dr. Marcos Hiroshi Ikeda, a Houston-based physician, for Promethazine with Codeine, Xanax, and Amoxicillin.  Witness 1 also possessed completed but unsigned prescriptions in the names of various patients from Dr. Fredrick Buckwold, another Houston-based physician, for Promethazine with Codeine, Soma, and Amoxicillin.  Witness 1 was later interviewed shortly after the stop and admitted to agents that these prescriptions were fraudulent.  Witness 1 told officers that they obtained the controlled substances from the **SUBJECT LOCATION** just prior to the traffic stop.

35. On August 2, 2017, investigators established surveillance at the **SUBJECT LOCATION** and observed Witness 1 again enter the **SUBJECT LOCATION** with a backpack and exit minutes later with the same backpack.  Investigators observed Witness 1 enter the passenger side of a vehicle and depart.  After observing a traffic violation, the vehicle was stopped by HPD officers.  Michael Berry was identified as the driver.  Berry gave HPD officers verbal consent to search his vehicle.  During the search, officers located five bottles of oxycodone containing approximately 600 tablets and 10 bottles of hydrocodone containing approximately 1,322 tablets. Barnes was the pharmacist listed on each bottle.  Witness 1 possessed an invoice from the **SUBJECT LOCATION** that indicated that they had purchased controlled substances for $8,100.00. In addition, Witness 1 possessed a receipt issued from Long with fraudulent patient names.

36. After I verbally advised Witness 1 of their Miranda warnings, they agreed to speak to investigators.  Witness 1 explained that fraudulent prescriptions were faxed to the

**SUBJECT LOCATION** earlier that same day for the controlled substances they purchased.   Witness 1 estimated that they have purchased/received controlled substances from the **SUBJECT LOCATION** a minimum of 35 times since November of 2016.  Witness 1 told agents that they paid between $6,000 to $8,000 during previous purchases of controlled substances at the **SUBJECT LOCATION** and Long was usually their point of contact.  Witness 1 said the patient names on the receipts and pill bottles they purchased from the **SUBJECT LOCATION** were fictitious, including those seized from Witness 1 on July 26, 2017.

37. Based on my training and experience, when unauthorized persons counterfeit prescriptions using stolen DEA numbers, they usually direct recipients of these fraudulent prescriptions to pharmacies like the **SUBJECT LOCATION**, which will accept over-market cash payments in exchange for filling the prescriptions without verifying their authenticity.

38. Furthermore, in my training and experience, it is common for pharmacies that divert controlled substances to require individuals to pay cash, which allows the pharmacy to charge above-market rates and to avoid detection from private insurance companies, Medicare, and Medicaid.   As stated previously, the **SUBJECT LOCATION** does not accept insurance.

39. Since July 2017, a Confidential Informant ("CI") has routinely picked up controlled substances from Long at the **SUBJECT LOCATION** on behalf of an individual named Frasiel Hughey.  Typically, the CI would receive a text message from Long and then the CI would retrieve money from Hughey to purchase the controlled substances at the **SUBJECT LOCATION** from Long, and then deliver the

controlled substances back to Hughey. The CI has purchased/picked up controlled substances from the **SUBJECT LOCATION** approximately 50 times. Furthermore, on at least two occasions, the CI informed agents that he/she has purchased approximately $60,000 worth of controlled substances at the **SUBJECT LOCATION** on behalf of Hughey.

40. On August 15, 2017, Hughey gave the CI a bulky white envelope containing fraudulent prescriptions that the CI delivered to Long at the **SUBJECT LOCATION**. On August 16, 2017, the CI received a text message from telephone number 713-898-3640, which is a phone utilized by Long. Long stated, "Good morning, your total for today is $20,440. Includes 20 oxy (oxycodone), 16 cough (promethazine with codeine) and 1 percent (Percocet). You will be ready by 10:30."

41. On August 17, 2017, the CI, equipped with audio/video recording devices and DEA official funds (*i.e.*, "buy money"), traveled to the **SUBJECT LOCATION**. Upon arrival, the CI met Long at the front counter. The CI gave Long the buy money to purchase the controlled substances. Long subsequently utilized a money counter to count the money. During the video, Long can be heard saying he threw in plenty of "sides" (specifically, alprazolam and carisoprodol), which Long provided to the CI at no additional cost. Long was observed handing the CI two white bags of controlled substances including "sides."

42. In total, the CI purchased 21 bottles of oxycodone containing approximately 2,519 tablets, 16 bottles of promethazine with codeine, 20 bottles of carisoprodol 350mg (muscle relaxer) containing approximately 1,794 tablets, and 15 bottles of

alprazolam 2mg tablets containing approximately 902 tablets from Long at the **SUBJECT LOCATION**, all for no legitimate medical purpose. Barnes was the pharmacist listed on each seized pill bottle. DEA is in possession of these narcotics.

43. I know from my training and experience that oxycodone and/or hydrocodone, alprazolam, and carisoprodol, are all components of what is known as the commonly abused "Houston Cocktail." When taken together, each drug intensifies the effects of the others, creating a greater high, which can sometimes be deadly.

44. On November 1, 2017, I conducted a spot check surveillance at the **SUBJECT LOCATION** and observed Dustin Curry's brown Ford truck, bearing Texas license plate number JGY6750, parked in the parking lot of the **SUBJECT LOCATION**.

45. On November 7, 2017, I conducted a spot check surveillance at the **SUBJECT LOCATION** and observed Clint Carr's white Ford truck, bearing Texas license plate number JDT7603 parked in the parking lot of the **SUBJECT LOCATION**.

46. According to Department of Motor Vehicle, both of the above-noted vehicles are registered to the **SUBJECT LOCATION**.

47. Based on the facts I and other investigators have learned during the course of this investigation, through interviews, surveillance and seizures of controlled substances; and my training and experience, there is probable cause to believe that actions at the **SUBJECT LOCATION** are not the result of occasional inadvertent or even negligent failures to verify the authenticity of controlled substances prescriptions, but instead reflect clear violations of 21 U.S.C. § 841 by Carr, Curry,

Barnes, and Long at the **SUBJECT LOCATION**, for knowingly dispensing controlled substances in violation of that Title.

48. I believe that a large number of controlled substances prescriptions filled at the **SUBJECT LOCATION** were fraudulent, which investigators verified by interviewing physicians whose DEA numbers were used without their authorization for some of the prescriptions that investigators seized in this investigation.

## G. DEA ARCOS and Texas PMP data analysis

49. DEA registrants who manufacture and/or distribute schedule II controlled substances are required to report all acquisition and distribution transactions to DEA's Automated Records and Consolidated Ordering System ("ARCOS") unit. The ARCOS database captures each pharmaceutical transaction from the point of manufacture to the point of sale.

50. Transaction purchase information obtained from ARCOS from eight DEA registered distributors show that from January 1, 2017 through October 16, 2017, the **SUBJECT LOCATION** purchased 108,900 dosage units of hydrocodone and 122,200 dosage units of oxycodone.

51. According to information contained in ARCOS, there are approximately 2,058 retail and chain pharmacies in the DEA Houston Office's area of responsibility. The **SUBJECT LOCATION** is ranked # 7 for the purchase of oxycodone and #78 for the purchase of hydrocodone out of those 2,058 pharmacies.

52. The Prescription Monitoring Program ("PMP") is a database maintained by the Texas State Board of Pharmacy ("TSBP") that tracks all controlled-substance

prescriptions issued and dispensed in the State of Texas. The data is self-reported by pharmacies to TSBP and is maintained for up to one year on the PMP, though there is approximately a seven-day lag time between the time the pharmacy reports the data and the time the data appears in the system. The database is searchable by provider, patient, and pharmacy. As of September 18, 2017, there were no records listed in the PMP for prescriptions filled at the **SUBJECT LOCATION**.

## H. Probable Cause that Evidence of Crimes is Located at the Subject location

53. The **SUBJECT LOCATION** to be searched is further described and depicted in Attachment A, which is incorporated by reference into this affidavit.

54. To correctly identify the **SUBJECT LOCATION**, DEA and other law enforcement agencies have made searches of various databases and employed various methods of investigation including, but not limited to, the following:

   a.    searches of the Texas Secretary of State database;

   b.    review of UPS and FedEx records;

   c.    surveillance of locations to observe individuals, vehicles, and activity;

   d.    visit by CI to purchase controlled substances inside the **SUBJECT LOCATION**; and

   e.    public database checks of the subject location.

55. Based on my training and experience and knowledge of this investigation, I believe that the subject location is knowingly dispensing controlled substances for no legitimate medical purpose and outside the scope of professional practice. I believe that all of the files reflecting this activity will be located at the **SUBJECT LOCATION** either in hard copy (*i.e.*, paper) format and/or electronically on computers/laptops located at the **SUBJECT LOCATION**, as well as any electronic

Page **17** of **20**

devices located at the **SUBJECT LOCATION**.  Based on my training and experience, I know the following:

a.     Persons involved in drug trafficking—including through pharmacies like the **SUBJECT LOCATION**—often keep controlled substances, proceeds of drug sales, records of drug transactions and other records within their residences and businesses or within ready access, *i.e.*, in their storage areas, offices, homes, and vehicles, and conceal such items from law enforcement authorities.  The drugs/prescriptions may be sold but documentary records and ledgers remain.

b.     Persons involved in drug trafficking, including through pharmacies like the **SUBJECT LOCATION**, often purchase real estate, vehicles, or other expensive items using drug trafficking proceeds and maintain records, documents, or materials, evidencing such purchases in their offices, residences, or vehicles.

c.     It is common knowledge within the law enforcement community that drug transaction records, books, account ledgers, payments, or notes and other evidence of financial transactions relating to obtaining, transferring, and spending substantial sums of money that result from engaging in drug trafficking activities are often maintained at or in the target's residences, businesses, safe deposit boxes, vehicles, and storage areas.

d.     Persons involved in drug trafficking, including through pharmacies like the **SUBJECT LOCATION**, often retain personal and business

notes, letters, and correspondence relating to their prescription orders at or in their residences, businesses, vehicles, safe deposit boxes and storage areas.

e.     Pharmacies routinely maintain patient records on-site and, under Texas state law and regulation, as described above, are required to keep records of the controlled substance prescriptions they fill and the controlled substances they dispense.     From my training and experience, I know that pharmacies keep these types of patient records and controlled-substance records on paper, electronically on computers, or in other electronic formats.   I also know based on my training and experience that pharmacists and pharmacy employees involved in diversion activities transport patient records and documents—both paper and electronic copies stored on laptops and in other electronic formats—in their vehicles to other locations, including their residences, to review and update these records.

56. I expect that investigators will find evidence of controlled substances distribution within the **SUBJECT LOCATION** in the form of controlled substances, United States currency, records relating to the ownership and business operation of the **SUBJECT LOCATION**, medical records (in any format including paper records and electronic records), sign-in sheets, charts, billing logs, payment records, prescriptions, patient files with fictitious documentation, dispensing logs, invoices, inventories, computers, computer servers and external hard drives, audio and video

surveillance equipment and related storage media, as described more particularly in Attachment B, hereby incorporated by reference.

### Conclusion

57. Based upon the foregoing, there is probable cause to believe that the **SUBJECT LOCATION** contains evidence of violations of Title 21, United States Code, Section 841(a)(1), unlawful distribution of controlled substances; Section 846, conspiracy to unlawfully distribute controlled substances; and Section 856 (a)(2), maintaining a drug-involved premises.

Anthony Armour, Special Agent
Drug Enforcement Administration

Subscribed to and sworn before me this 14 day of November, 2017, and I find probable cause.

HONORABLE FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE