# EXHIBIT L

KeyCite Yellow Flag - Negative Treatment
Distinguished by United States v. Jarvis, D.N.M., February 26, 2008

97 Hawai'i 512
Supreme Court of Hawai'i.

STATE of Hawai'i, Plaintiff–Appellant,
v.
Richard Sung Hong WONG, Mari Stone Wong, and Jeffrey R. Stone, Defendants–Appellees.
State of Hawai'i, Plaintiff–Appellant,
v.
Henry Haalilio Peters and Jeffrey R. Stone, Defendants–Appellees.

Nos. 22671, 23151.
|
Feb. 22, 2002.

**Synopsis**
Defendants were charged with theft, commercial bribery, perjury, hindering prosecution, and criminal conspiracy. The First Circuit Court, Michael R. Town, J., dismissed. State appealed. The Supreme Court held that: (1) prosecutor engaged in misconduct by presenting testimony of defendant's tax attorney to the grand jury without first seeking judicial review on attorney-client privilege; (2) it was prosecutorial misconduct at grand jury stage to omit clearly exculpatory testimony; and (3) dismissal with prejudice was proper remedy.

Affirmed in part, vacated in part, and remanded with instructions.

West Headnotes (15)

[1] **Criminal Law**  ⚖  Amendments and rulings as to indictment or pleas

An appellate court reviews a trial court's decision to dismiss an indictment for abuse of discretion.

9 Cases that cite this headnote

[2] **Criminal Law**  ⚖  Discretion of Lower Court

The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.

9 Cases that cite this headnote

[3] **Criminal Law**  ⚖  Burden of showing error

The burden of establishing abuse of discretion by the trial court is on the appellant, and a strong showing is required to establish it.

9 Cases that cite this headnote

[4] **Grand Jury**  ⚖  Conduct of proceedings in general

The Circuit Court has supervisory power over grand jury proceedings to insure the integrity of the grand jury process and the proper administration of justice.

3 Cases that cite this headnote

[5] **Grand Jury**  ⚖  Privilege
**Privileged Communications and Confidentiality**  ⚖  Determination

Imposition of burdens of proof or persuasion necessarily require that questions concerning attorney-client privilege must be put before and decided by a judge, whether the testimony is sought in criminal or civil proceedings, before a grand jury, in discovery, or at trial. Rules of Evid., Rule 104.

3 Cases that cite this headnote

[6] **Privileged Communications and Confidentiality**  ⚖  Determination

When a prosecutor seeks testimony that is arguably subject to attorney-client privilege, he must either: (1) give notice to the person who might claim the privilege and the person's counsel, so that the person or the person's attorney can seek judicial review of any claim or privilege or waive the privilege, or (2) give notice to the person's counsel and, if the person's counsel does not raise the privilege and seek

judicial review, the **prosecutor** must seek the court's ruling on the **privilege** issue. Rules of Evid., Rules 104, 503.

2 Cases that cite this headnote

**[7]** **Privileged** Communications and Confidentiality 🔑 Determination

Legitimate law enforcement may require that witnesses be questioned in confidence, and when issue of **privilege** is involved, each such case must be judged on its own merits to determine whether judicial determination of **privilege** without presence and argument of person entitled to claim **privilege** will meet requirements of due process; at minimum, in absence of opportunity for **privilege** holder to raise issue or in face of faithless lawyer failing to raise issue before court of competent jurisdiction, **prosecutor** must seek court ruling on **privilege** issue. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[8]** Grand Jury 🔑 Privilege

**Prosecutor** engaged in misconduct in criminal conspiracy case by presenting testimony of defendant's tax attorney to the grand jury without providing notice to defendant and by his bolstering attorney's testimony by characterizing it as subject to the crime-fraud exception to the **attorney**-**client** **privilege** without first seeking judicial review on the matter; **prosecutor's** actions overreached and usurped the grand jury's function to determine whether there was probable cause to believe that a crime was committed. Rules of Evid., Rules 104, 503.

4 Cases that cite this headnote

**[9]** **Indictments** and Charging Instruments 🔑 **Prosecutorial** misconduct

**Prosecutor's** misconduct in criminal conspiracy case of improperly presenting testimony of defendant's tax attorney to the grand jury so tainted the grand jury process that it was appropriate to **dismiss** **indictment** against codefendants, where **prosecutor** presented testimony without providing notice to defendant and he bolstered the testimony by characterizing it as subject to the crime-fraud exception to the **attorney**-**client** **privilege** without first seeking judicial review on the matter. Rules of Evid., Rules 104, 503.

6 Cases that cite this headnote

**[10]** Grand Jury 🔑 Privilege

**Prosecutor** engaged in misconduct in theft case by presenting testimony of estate's attorney, which **violated** court's order that there would be no attorney testimony without judicial review regarding **attorney**-**client** **privilege**, and prejudiced defendant in that testimony left the impression that it was a breach of trust for defendant, an estate trustee, to invest in projects related to estate's investments. Rules of Evid., Rules 104, 503.

1 Cases that cite this headnote

**[11]** Grand Jury 🔑 Scope of proof; admissibility

**Prosecutor** engaged in misconduct, at grand jury stage of perjury case, by preventing witness from providing clearly exculpatory testimony; perjury allegedly occurred in prior grand jury proceeding when defendant testified that witness told him to contact a third party about buying a condominium unit, but **prosecutor** in the subsequent proceeding did not allow witness to testify about his role in the matter, which would have been the only direct testimony on the subject.

1 Cases that cite this headnote

**[12]** **Indictments** and Charging Instruments 🔑 **Prosecutorial** misconduct

**Dismissal** of an **indictment** due to **prosecutorial** misconduct is required only in flagrant cases in which the grand jury has been overreached or deceived in some significant way.

1 Cases that cite this headnote

**[13]** **Indictments** and Charging Instruments 🔑 Finding of the Grand Jury

If the illegal or improper testimony clearly appears to have improperly influenced the grand jurors despite the presence of sufficient evidence amounting to probable cause to **indict** the defendant, then the defendant would be entitled to a **dismissal**.

1 Cases that cite this headnote

**[14]** **Indictments** and Charging Instruments 🔑 Finding of the Grand Jury

When a defendant's substantial constitutional right to a fair and impartial grand jury proceeding is prejudiced, a quashing of the **indictment** emanating therefrom is an appropriate remedy.

2 Cases that cite this headnote

**[15]** **Indictments** and Charging Instruments 🔑 **Prosecutorial** misconduct

**Dismissal**, with prejudice, of **indictments** charging perjury, criminal conspiracy, theft, and other offenses was proper remedy for **prosecutor's** misconduct before grand jury of presenting testimony in **violation** of **attorney**-**client** **privilege** and omitting clearly exculpatory testimony; **prosecutor's** actions, some of which were taken in contravention of the Circuit Court's clear instructions to seek preliminary judicial review, represented a serious threat to the integrity of the judicial process. Rules of Evid., Rules 104, 503.

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*916 \*514** Lawrence A. Goya, (Joanne L. Ha'o, with him on the briefs), Deputy Attorneys General, for plaintiff-appellant/cross-appellee.

Eric A. Seitz, (Lawrence I. Kawasaki with him on the brief), Honolulu, (Ronald H. Malone of San Francisco, CA, pro hac vice, with him on the brief), for defendant-appellee Richard Sung Hong Wong.

John Edmunds, (Ronald J. Verga, with him on the brief) of Edmunds, Maki, Verga and Thorn, Honolulu, for defendant-appellee Jeffrey R. Stone.

Renee M.L. Yuen, Honolulu, for defendant-appellee Henry Haalilio Peters.

Jerel Fonseca of Fonseca & Ching, on the brief, Honolulu, for defendant-appellee Mari Stone Wong.

Circuit Judge MASUOKA, Acting C.J., in Place of MOON, C.J., Recused; Circuit Judge IBARRA, in Place of LEVINSON, J., Recused; Circuit Judge KOCHI, in Place of NAKAYAMA, J., Recused; Circuit Judge RAFFETTO, in Place of RAMIL, J., Recused; and Circuit Judge CHANG, in Place of ACOBA, J., Recused; Acting JJ.

**Opinion**

PER CURIAM.

Plaintiff–Appellant **State** of Hawai'i appeals from orders **dismissing** **indictments** against Defendants–Appellees Richard Sung Hong Wong, Mari Stone Wong, Henry Haalilio Peters, and Jeffrey R. Stone. The circuit court orders, entered by the Honorable Michael R. Town, were entered without prejudice. We affirm the **dismissals**, but remand with instructions to enter the **dismissal** orders with prejudice.

I. *Background*

A. *Appeal No. 22671, First Circuit Criminal No. 99–0678*
The Office of the Attorney General secured an **indictment** against Richard Sung Hong Wong (Wong), Jeffrey R. Stone (Stone), and Mari Stone Wong (M.Wong). The **indictment's** charges of theft in the first degree (Wong), commercial bribery (Stone), perjury (Wong), hindering prosecution in the first degree (M.Wong), and criminal conspiracy (Wong, Stone, and M. Wong), arose out of a series of business and personal transactions. In sum, the **indictment** alleged that Wong, a trustee of the Bishop Estate/Kamehameha Schools (Estate), manipulated the Estate into giving his brother-in-law, Stone, a "sweetheart deal" on what was called the Kalele Kai project and, in return, Stone secured for Richard and Mari Wong a sale price for their apartment that was $115,800 more than the apartment was worth. According to the **State**, the $115,800 was money that should have gone to the Estate and

Wong's keeping of the money was a theft from the Estate. All of the other charges relate to the alleged theft or the investigation of it.

According to the testimony before the grand jury, the Kalele Kai project was a leasehold condominium construction project on Estate land. The developer, Bedford Properties, borrowed seventy-six million dollars from Mitsui Bank and Trust Company and formed a partnership, Kapalele Associates, with Mitsui to develop the project.

Kapalele Associates had cash flow problems when the leasehold units did not sell. To generate sales, Kapalele Associates purchased the fee interest from Estate for $21.9 million. The fee interest was purchased by agreement of sale. However, Kapalele Associates eventually defaulted on the Mitsui Bank loan and could not perform the agreement of sale for the fee interest. In the summer of 1995, Stone offered to buy the Kalele Kai project and to assume the fee purchase agreement with Estate. To finance the purchase, a Stone company, Pacific Northwest Ltd., and an Ohio corporation, the National Housing Corporation, formed One Keahole Partners (OKP), a partnership.

**917 *515 Stone sent OKP's proposal to Trustee Wong. Wong forwarded the proposal to the Principal Executive of the Estate's Asset Management Group. Wong recused from trustee deliberations concerning OKP's Kalele Kai proposal. OKP acquired the Kalele Kai project after a majority of the remaining trustees approved OKP's assumption of the fee purchase agreement.[1]

In 1996 Stone's company, Pacific Northwest, Ltd., purchased a Kahala home that was in foreclosure, renovated the home, and sold the home to Richard and Mari Wong. The Wongs financed the home, in part, with a $613,200 credit for their Wilder Avenue apartment. The State alleged the Wilder Avenue apartment was worth no more than $498,000 and that the $115,800 difference between the $498,000 value of the Wilder Avenue apartment and the $613,800 credit was a payoff by Stone for the Kalele Kai deal and a theft by Wong of monies due the Estate.

To secure the indictments, the State called, among others, Stone's former tax lawyer, disbarred attorney Richard Frunzi,[2] to testify before the grand jury. The State called Frunzi before the grand jury without seeking a court ruling about the extent to which Frunzi could testify.[3]

Frunzi did not notify Stone that Frunzi was going to testify before the grand jury and Frunzi did not get Stone's permission to testify about their professional relationship. Frunzi testified without raising any privilege issue on behalf of his former client, Stone. At the State's urging, Frunzi explained his testimony to the grand jury:

> [State]: Now, prior to asking you questions about Mr. Stone, do you recognize that there ordinarily would be a prohibition from you testifying about those kinds of matters?
>
> [Frunzi]: Yes. The rules of the Bar Association and the Code of Professional Conduct prohibit an attorney from divulging any confidential communications or proprietary information to a client—about a client to anybody else, but there are certain exceptions. And one of the exceptions is that if a crime is committed or to be committed, there's what's called a crime fraud exception.
>
> [State]: Okay. And that's what you are basing your ability to testify on today.
>
> [Frunzi]: Yes

Richard Wong, joined by Mari Wong and Jeffrey Stone, moved to dismiss the indictment for lack of probable cause and prosecutorial misconduct. The circuit court granted the motion and dismissed the indictment without prejudice. The circuit court explained:

> [T]his Court will respectfully grant the motions to—Defendants' Motion to Dismiss the indictment for the following reasons:
>
> One, the government used the privileged testimony of an attorney, Richard Frunzi, albeit at that time he was suspended in lieu of discipline, he was also incarcerated in federal custody pending sentencing, although that's not terribly relevant. And this privileged testimony did not meet the crime-fraud exception to the Hawai'i Rules of Evidence. I think that's very clear.
>
> Neither Mr. Frunzi, nor the government, notified Mr. Stone or the Court that **918 *516 his attorney, Mr. Stone's attorney, Mr. Frunzi, would be testifying.
>
> Further, the government on its own did not seek Court review ahead of time as this Court believes is required by law.

Secondly, the Court finds that the government, by attesting to the quality of the testimony, by referring to or allowing Mr. Frunzi to refer to it as under the crime-fraud exception before the grand jury who are lay persons from the general community, illegally bolstered Mr. Frunzi's testimony, thereby prejudicing the Defendants.

Assuming *arguendo* ... that there is no requirement to approach this Court as a supervising judge ahead of time, the Court finds, nevertheless, that Mr. Frunzi's testimony was, in fact, **privileged** and the crime-fraud exception did not apply.

The State appealed. Additional facts are set out below where necessary.

B. *Appeal Number 23151, First Circuit Criminal Number 99–1502*

The Office of the Attorney General secured an indictment against former Bishop Estate Trustee Henry Haalilio Peters (Peters) and Jeffrey R. Stone (Stone). The indictment's charges of theft in the first degree (Peters), commercial bribery (Stone), criminal conspiracy (Peters and Stone), accomplice to theft in the first degree (Stone), and perjury (Stone), arose out of the Kalele Kai transactions, set out above, and an allegation that Stone secured the sale of Peters' residential apartment for $192,500 more than its alleged value.

The indictment alleges, in sum, that Stone induced Peters to approve OKP's acquisition of the Kalele Kai project by convincing another person to pay more for Peters' apartment than it was worth, that Stone financed the purchase of the apartment through OKP, OKP accepted the deed to the apartment in lieu of repayment of the money borrowed to finance its purchase, and that Peters used the value of his apartment, including the alleged $192,500 excess, to purchase an apartment on a higher floor in the same building. The State alleges the $192,500 should belong to the Estate and that Peters' retention of that value is a theft from the Estate. These allegations formed the basis of the theft, commercial bribery, conspiracy, and accomplice to theft charges against Peters and Stone. In addition, the State alleged, in sum, that Stone lied to a prior grand jury when Stone testified that he was contacted by Glenn Okada about the availability of an upper floor unit in Peters' building and Okada told him to contact Peters about the possibility of buying the higher floor apartment.

In the course of presenting the case to the grand jury, the State called several witnesses, including Nathan Aipa, acting chief operating officer and formerly General Counsel for the Estate, and Glenn Okada, President and Chairman of the Board of GKO Corporations and GO Realty. The State did not seek the circuit court's approval before it called Aipa to testify, did not notify Peters that Aipa would testify, and did not secure a waiver of attorney-client privilege from Peters. Aipa was called, according to the State, "[t]o provide the grand jury with more specific information from which to determine whether Peters knew that any benefit he received from a transaction in which the trust was also involved needed to be returned to the trust[.]" To that end, the State questioned Aipa about an unrelated matter, referred to as the McKenzie Methane gas investment, for which legal advice was sought and conveyed to the trustees. The State questioned Okada about Peters' purchase of the higher floor apartment, but it did not allow Okada to explain that Okada, not Stone, initiated discussion of the transaction with Peters.

The State moved to *nolle prosequi* the criminal conspiracy charge and the motion was granted. Peters and Stone moved to dismiss the other counts. The circuit court granted the motions to dismiss, without prejudice. In granting the motions and dismissing the theft, accomplice to theft, and perjury charges, the circuit court said, in part:

> [T]he defendants' right to a fair and impartial grand jury proceeding was prejudiced by the Attorney General's misconduct ***517** in ****919** failing to seek permission of the court and to obtain a proper waiver of the attorney-client privilege from Henry Haalilio Peters prior to eliciting testimony before the grand jury from Nathan Aipa, Esq. on the subject of Trustee Peters' knowledge and involvement in the McKenzie methane gas investment, discussions and related legal opinion;
>
> ... the defendants' right to a fair and impartial grand jury proceeding was prejudiced by the Attorney General's preventing witness Glenn Okada from answering questions several times in order to suppress clearly exculpatory evidence;
>
> ... the attorney-client privilege is a sacred and important privilege and ... the violation of that privilege is unacceptable; ... the Attorney General's office was on crystal clear notice of the process to seek prior court permission to call attorneys before the grand jury and knew in fact that the court was supervising the grand jury; and that neither Trustee Peters or his counsel ... was given prior

notice by either the Attorney General or Mr. Aipa of the subpoena to the grand jury[.]

The circuit court dismissed the commercial bribery charge. In doing so, the circuit court explained:

> [T]he reason [for the dismissal] is that the government chose not to allow what could have been clearly exculpatory evidence by Glenn Okada for reasons of their own about Mr. Stone's committing perjury. That had to affect how the grand jury saw the other counts in the Court's view.
>
> Secondly, the criminal conspiracy matter never should have been brought, including the overt acts. And the fact it was, in the Court's view, could easily have influenced the grand jury. And all the other reasons set forth in the moving papers.

The circuit court denied reconsideration and the State appeals. Additional facts are set out below where necessary.

## II. *Standard of Review*

The State contends the circuit court erred when it granted the Defendants' motions to dismiss the indictments.

 [1]  [2]  [3]  An appellate court reviews a trial court's decision to dismiss an indictment for abuse of discretion. *State v. Chong,* 86 Hawai'i 282, 288 n.2, 949 P.2d 122, 128 n.2 (1997). The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant. *E.g., State v. Klinge,* 92 Hawai'i 577, 584, 994 P.2d 509, 516 (2000) (citations omitted). The burden of establishing abuse of discretion is on appellant, and a strong showing is required to establish it. *E.g., State v. Kupihea,* 80 Hawai'i 307, 312, 909 P.2d 1122, 1127 (1996) (citation omitted).

## III. *Discussion*

 [4]  A grand jury is a constituent part of the court or branch of a court having general criminal jurisdiction. *In re Moe,* 62 Haw. 613, 616, 617 P.2d 1222, 1224 (1980). The circuit court has supervisory power over grand jury proceedings to insure the integrity of the grand jury process and the proper administration of justice. *Id.; Cf. United States v. Williams,* 504 U.S. 36, 47, 112 S.Ct. 1735, 1742, 118 L.Ed.2d 352 (1992) (United States Supreme Court concluded the federal grand jury "belongs to no branch of the institutional Government" and that "its institutional relationship with the [federal] Judicial Branch has traditionally been, so to speak, at arm's length").

This court recently "reaffirm[ed] the principle that prosecutorial conduct that undermines the fundamental fairness and integrity of the grand jury process by 'invad[ing] the province of the grand jury or tend[ing] to induce action other than that which the jurors in their uninfluenced judgment deem warranted on the evidence *fairly* presented before them,' *[State v.] Joao,* 53 Haw. [226] at 229, 491 P.2d [1089] at 1091 [ [4] ] ... is **\*\*920 \*518** presumptively prejudicial." *State v. Chong,* 86 Hawai'i 282, 284, 949 P.2d 122, 124 (1997). This court explicitly stated that Justice Kidwell's concurrence in *State v. Bell,* 60 Haw. 241, 589 P.2d 517 (1978),

> ... accurately distilled *Joao's* relative place within "the criteria which should govern" the grant or denial of a motion to dismiss an indictment:
>
> ... [A] grand jury proceeding is not adversary in nature. An application of this principle is found in the rule that an indictment may not be attacked on the ground of the incompetency of the evidence considered by the grand jury, where prosecutorial misconduct is not involved. *State v. Layton,* 53 Haw. 513, 497 P.2d 559 (1972); *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). The function of a grand jury to protect against unwarranted prosecution does not entail a duty to weigh the prosecution's case against that of the defense, or even to determine that the prosecution's case is supported by competent evidence.
>
> On the other hand, an indictment that is the result of *prosecutorial misconduct or other circumstances which prevent the exercise of fairness and impartiality by the grand jury* may be successfully attacked. *State v. Joao,* 53 Haw. 226, 491 P.2d 1089 (1971); *State v. Pacific Concrete and Rock Co.,* 57 Haw. 574, 560 P.2d 1309 (1977).

State v. Wong, 97 Hawai'i 512 (2002)
40 P.3d 914
Case 4:18-cr-00339   Document 224-12   Filed on 01/26/22 in TXSD   Page 8 of 18

*Bell,* 60 Haw. at 256–57, 589 P.2d at 526 (Kidwell, J., concurring) (emphasis added).

*State v. Chong,* 86 Hawai'i 282, 288–89, 949 P.2d 122, 128–29 (1997) (footnote omitted). Most of the issues posed by the State concern application of the attorney-client privilege and application of the "crime-fraud" exception that allows otherwise privileged testimony to be presented. The United States Supreme Court has described the common law attorney-client privilege and the crime fraud exception as follows:

> We have recognized the attorney-client privilege under federal law, as the oldest of the privileges for confidential communications known to the common law.... Although the underlying rationale for the privilege has changed over time, ... courts long have viewed its central concern as one to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.... That purpose, of course, requires that clients be free to make full disclosure to their attorneys of past wrongdoings, ... in order that the client may obtain the aid of persons having knowledge of the law and skilled in its practice[.]
>
> The attorney-client privilege is not without its costs.... [S]ince the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose.... The attorney-client privilege must necessarily protect the confidences of wrongdoers, but the reason for that protection—the centrality of open client and attorney communication to the proper functioning of our adversary system of justice—ceas[es] to operate at a certain point, namely, where the desired advice refers not to prior wrongdoing, but to future wrongdoing.... It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the seal of secrecy, ... between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime....

*United States v. Zolin,* 491 U.S. 554, 562, 109 S.Ct. 2619, 2625–6, 105 L.Ed.2d 469 (1989) (quotation marks and citations omitted). The United States Court of Appeals for the Ninth Circuit explained:

> The attorney-client privilege is essential to preservation of liberty against a powerful government. People need lawyers to guide them through thickets of complex government requirements, and, to get useful advice, they have to be able to talk to their lawyers candidly without fear that what they say to their own lawyers will be transmitted to the government.

*United States v. Chen,* 99 F.3d 1495, 1499 (9th Cir.1996) (citation omitted).

**921 *519 In Hawai'i the common law attorney-client privilege and the exceptions to it are codified as Rule 503 of the Hawai'i Rules of Evidence (HRE). *See* HRS § 626–1, Rule 503 (1993);[5] *DiCenzo v. Izawa,* 68 Haw. 528, 535, 723 P.2d 171, 175 (1986) ("HRE 503 ... codified the common-law attorney-client privilege long recognized by the courts of Hawai'i"). The attorney-client privilege rule "applies at all stages of all actions, cases, and proceedings[,]" HRE Rule 1101(c), including grand jury proceedings. *See* HRE Rule 1101(d) ("The [Hawai'i] rules [of evidence] (*other than with respect to* privileges ) do not apply ... [to] ... proceedings before grand juries."). (Emphasis added.) The attorney-client privilege applies in both civil and criminal cases. HRE 503; *Swidler and Berlin v. United States,* 524 U.S. 399, 408–9, 118 S.Ct. 2081, 2087, 141 L.Ed.2d 379 (1998). The attorney-client privilege serves broader purposes than the constitutional privilege against self-incrimination. *Id.* at 407–408, 118 S.Ct. at 2086.

A. *Judicial determination of attorney-client privilege*
The State first argues the circuit court erred when it dismissed the indictment against Stone and the Wongs because the **922 *520 State did not seek judicial review before it presented Frunzi's testimony to the grand jury. The State opines it was not required to seek judicial review before it presented Frunzi's testimony to the grand jury. We disagree.

Rule 104 of the Hawai'i Rules of Evidence provides, with stunning clarity, that "[p]reliminary questions concerning ...

the existence of a **privilege** ... shall be determined by the court[.]" More than twenty years ago, this court set out the procedure to be followed when issues about the **attorney-client privilege** or exceptions to the **privilege** are raised. This court said the burden of establishing the **privilege** was upon the party asserting it and set out the manner in which **privilege** could be proven. The court instructed that

> [*p*]*roper practice requires preliminary judicial inquiry into the existence and validity of the* **privilege** *and the burden of establishing the* **privilege** *rests on the claimant*[,] ... [*and observed*] Any other rule would "foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed."

*Sapp v. Wong,* 62 Haw. 34, 38–39, 609 P.2d 137, 140 (1980) (citations omitted; emphasis added). See also *DiCenzo v. Izawa,* 68 Haw. 528, 536, 723 P.2d 171, 176 (1986) ("A proper application of the codified **privilege** ... requires preliminary judicial inquiry into the existence and validity of the **privilege** ... [o]therwise, meaningful inquiry into the existence of an **attorney-client** relationship ... and the character of the communication ... would be foreclosed.") (quotation marks and citations omitted).

In addition, a host of foreign case authority **states**, in sum, that the **attorney-client privilege** belongs to the client, the burden of establishing the **attorney-client privilege** falls upon the client, and the burden of establishing the crime fraud exception to the **attorney-client privilege** falls upon the proponent of the exception. See, e.g., *Swidler and Berlin v. United States,* 524 U.S. 399, 118 S.Ct.2081, 141 L.Ed.2d 379 (1998) (grand jury subpoena; scope of **privilege**); *In re Sealed Case,* 223 F.3d 775 (D.C.Cir.2000) (grand jury subpoena); *In re Grand Jury Subpoena,* 187 F.3d 996 (8th Cir.1999) (grand jury subpoena; motion to compel); *Chaudhry v. Gallerizzo,* 174 F.3d 394 (4th Cir.1998) (pretrial motion to compel); *In re Richard Roe, Inc.,* 168 F.3d 69 (2d Cir.1999) (appeal from civil contempt order for defiance of order requiring testimony and disclosure of documents to grand jury); *In re Sealed Case,* 162 F.3d 670 (D.C.Cir.1998) (motion to quash grand jury subpoena); *In re Grand Jury Proceedings Grand Jury No. 97–11–8,* 162 F.3d 554 (9th Cir.1998) (appeal from order requiring former attorney to testify before grand jury); *In re Bruce R. Lindsey,* 158 F.3d 1263 (D.C.Cir.1998) (motion to compel grand jury testimony); *In re Grand Jury Subpoenas,* 144 F.3d 653 (10th Cir.1998) (motion to compel grand jury testimony); *United States v. Rakes,* 136 F.3d 1 (1st Cir.1998) (pre-trial motion to suppress); *United States v. Bauer,* 132 F.3d 504 (9th Cir.1997) (trial testimony); *In re Sealed Case,* 107 F.3d 46 (D.C.Cir.1997) (appeal from contempt citation for failure to testify and produce documents); *In re Grand Jury Proceedings,* 102 F.3d 748 (4th Cir.1996) (action to quash grand jury subpoenas); *United States v. Chen,* 99 F.3d 1495 (9th Cir.1996) (appeal challenging order denying motions to quash grand jury subpoena); *In re Grand Jury Proceedings,* 87 F.3d 377 (9th Cir.1996) (appeal from district court order requiring former corporate counsel to testify before grand jury); *Olson v. Accessory Controls and Equipment Corp.,* 254 Conn. 145, 757 A.2d 14 (2000) (review of protective order in wrongful termination action); *Lahr v. State of Indiana,* 731 N.E.2d 479 (Ind.App.2000) (criminal appeal; trial testimony); *Purcell v. District Attorney for the Suffolk District,* 424 Mass. 109, 676 N.E.2d 436 (1997) (motion to quash subpoena to testify at trial); *In re Grand Jury of Philadelphia County,* 527 Pa. 432, 593 A.2d 402 (1991) (appeal from orders entered in conjunction with supervision, administration, and operation of grand jury; notes seized pursuant to search warrant); *Morley v. MacFarlane,* 647 P.2d 1215 (Colo.1982) (appeal from order denying injunctive relief); *Henderson v. State,* 962 S.W.2d 544 (Tex.Crim.App.1998) (criminal appeal; trial testimony); *People v. Paasche,* 207 Mich.App. 698, 525 N.W.2d 914 (1994) **\*\*923 \*521** criminal appeal; search warrant for attorney's files); *State v. Fodor,* 179 Ariz. 442, 880 P.2d 662 (Ct.App.1994) (criminal appeal; wiretap conversation between attorney and client); *Levin v. C.O.M.B. Co.,* 469 N.W.2d 512 (Minn.Ct.App.1991) (civil appeal from protective order); *In re Grand Jury Subpoena ad Testificandum Served on Louis Gonnella, Esq.,* 238 N.J.Super. 509, 570 A.2d 53 (1989) (motion to quash grand jury subpoena); *In re Grand Jury Subpoena of Lynne Stewart,* 144 Misc.2d 1012, 545 N.Y.S.2d 974 (Supr.Ct.1989) (motion to quash grand jury subpoena).[6]

[5] Imposition of burdens of proof or persuasion necessarily require that questions concerning **attorney-client privilege** must be put before and decided by a judge, whether the

Case 4:18-cr-00339   Document 224-12   Filed on 01/26/22 in TXSD   Page 10 of 18
State v. Wong, 97 Hawai'i 512 (2002)
40 P.3d 914

testimony is sought in criminal or civil proceedings, before a grand jury, in discovery, or at trial. To the extent the circuit court concluded the State should have sought judicial review before presenting Frunzi's testimony to the grand jury, the circuit court was correct as a matter of law and did not abuse its discretion.

 [6]   [7]   In sum, when a prosecutor seeks arguably privileged testimony, the prosecutor must either (1) give notice to the person who might claim the privilege and the person's counsel, so that the person or the person's attorney can seek judicial review of any claim or privilege or waive the privilege, or (2) give notice to the person's counsel and, if the person's counsel does not raise the privilege and seek judicial review, the prosecutor must seek the court's ruling on the privilege issue. In the latter instance, the prosecutor should proceed with the understanding that if the person who might claim the privilege has not been given notice and an opportunity to be heard on the issue of privilege, a court's allowance of testimony may be overturned after the holder of the privilege can be heard by the court.[7]

B. *The State improperly presented and bolstered Frunzi's testimony.*

The State contends the trial court erred when it found Richard Frunzi's testimony was protected by attorney-client privilege and should not have been presented to the grand jury. The State argues that Stone failed to present proof, in support of his motion to dismiss, that the communications between Stone and Frunzi were intended to be confidential and concerned legal services that Stone was seeking from Frunzi. The State opines Stone's testimony on the post-indictment motion to dismiss was nothing more than an impermissible blanket claim of privilege. The State opines the circuit court should have "insisted in being shown, line by line, if necessary exactly what statements of Frunzi's, if any, were privileged[.]" In addition, the State opines the crime-fraud exception to the attorney-client privilege applied, that the State did not improperly bolster Frunzi's testimony, and that the Wongs cannot assert Stone's attorney-client privilege to bar the State from indicting them.

In other circumstances we might engage in lengthy discussion about the client's burden to establish the attorney-client privilege as noted above.[8] In the circumstances of this case, however, our focus is upon whether the State's pre-indictment actions prevented the **924 *522 grand jury from the "exercise of fairness and impartiality" that due process demands. *See e.g., State v. Chong,* 86 Hawai'i 282, 289, 949 P.2d 122, 129 (1997) (quoting *Bell, supra* and *Joao, supra* ). The issue that was before the circuit court and that is before this court is whether the indictment should have been dismissed due to prosecutorial misconduct.

The State's arguments that Stone failed to meet his burden of establishing the attorney-client privilege in the post-indictment proceedings are not well taken. Had Stone or the State sought "preliminary judicial inquiry into the existence and validity of the privilege," *Sapp v. Wong,* 62 Haw. at 38, 609 P.2d at 140, Stone would certainly have borne the burden of showing the attorney-client privilege applied. In other circumstances Stone's failure to assert the privilege before the testimony was presented to the grand jury might have led to a conclusion Stone waived the privilege. The State, however, did not give Stone the opportunity to raise the privilege issue so that a preliminary judicial determination could be made and Frunzi did not raise the privilege issue on Stone's behalf. Instead, the State presented Frunzi's testimony to the grand jury without notice to Stone. In addition, the State presented Frunzi's testimony to the grand jury as privileged testimony to which the crime-fraud exception applied.

When the State called Frunzi as a witness, it elicited testimony from him that Frunzi (1) would "be talking about [Frunzi's] specific representation of [his] client, Jeffrey Stone[,]" (2) that "there ordinarily would be a prohibition from [Frunzi] testifying about those kinds of matters[,]" but (3) that Frunzi could testify "if a crime is committed or to be committed[.]" The State elicited Frunzi's testimony without any distinction as to matters that might or might not be covered by the attorney-client privilege. With regard to the crime-fraud exception, the State's examination emphasized Frunzi's judgment that crimes had been or were to be committed by eliciting from Frunzi his affirmation "... that's what [he was] basing [his] ability to testify on today[.]"

 [8]   [9]   The State's emphasis on the extraordinary nature of Frunzi's testimony and its emphasis that Frunzi was testifying under the crime-fraud exception to the attorney-client privilege clearly invaded the grand jury's function of determining whether there was probable cause to believe a crime had been committed by putting before the grand jury the attorney's conclusion that crimes had been or were about to be committed when the attorney was consulted. The State's actions in this regard overreached and usurped the grand jury's function of determining probable cause as to whether a crime was committed, were an egregious disregard of Stone's

right to an impartial grand jury, and tainted the grand jury process to such an extent that we cannot say the circuit court abused its discretion when it also dismissed the indictment against the Wong defendants. Having presented Frunzi's testimony without a judicial determination of privilege and having bolstered Frunzi's testimony by characterizing it to the grand jury as privileged testimony subject to the crime-fraud exception to the privilege, the State is in no position to now argue that Stone failed to meet his burden with regard to the existence of the attorney-client privilege.

C. *The State improperly presented Aipa's testimony*
The State argues that presenting Aipa's testimony to the grand jury did not prejudice defendants' rights to a fair and impartial grand jury; argues that Aipa's testimony did not touch on privileged matters; argues that if Aipa's testimony was privileged, the privilege belonged to the Estate, not to Peters; and argues the Estate waived any privilege it might have had by disclosing the communications to others. Additionally, the State again argues that "notice and judicial preclearance are not prerequisites for presenting testimony from an attorney to a grand jury" and opines that the circuit court could not require the prosecutor to preclear Aipa's testimony under the circuit court's general supervisory powers over the grand jury. We disagree.

Unlike a federal grand jury, a Hawai'i grand jury is a constituent part of the court or branch of a court having general criminal jurisdiction. *In re Moe,* 62 Haw. 613, 616, 617 P.2d 1222, 1224 (1980); *Cf. United States* **\*\*925 \*523** *v. Williams,* 504 U.S. 36, 37, 112 S.Ct. 1735, 1742, 118 L.Ed.2d 352 (1992) (the federal grand jury "belongs to no branch of the institutional government"). The circuit court has supervisory power over grand jury proceedings to insure the integrity of the grand jury process and the proper administration of justice. *Moe,* 62 Haw. at 616, 617 P.2d at 1224. The circuit court properly exercised its supervisory authority, upon dismissing a prior indictment, when it gave the State clear direction that a judicial determination of privilege was necessary before attorney testimony could be presented to the grand jury. The State ignored that clear direction and presented Aipa's testimony without notice to Peters and without seeking a judicial determination about attorney-client privilege.

[10] The State's attorney was duty bound to comply with the circuit court's requirement unless and until the requirement was overruled by a court of competent jurisdiction. Instead, the State ignored the circuit court's requirement and put before the grand jury attorney testimony that had not been reviewed for the existence and validity of the attorney-client privilege as required by the rules of evidence, *see* discussion at III. A. above, and the circuit court's order. Finding that the State had presented attorney testimony to the grand jury in violation of the court's clear order and concluding that disregard of its clear order warranted dismissal, the circuit court exercised its supervisory powers and dismissed the indictment.

The circuit court did not make a finding that violation of its order resulted in actual prejudice to Peters, but actual prejudice is clearly shown by the record. The State's presentation of Aipa's testimony clearly induced an action other than that which grand jurors in uninfluenced judgment would have deemed warranted on evidence fairly presented to them. *See State v. Joao,* 53 Haw. 226, 229, 491 P.2d 1089, 1091 (1971). When presenting Aipa's testimony regarding the McKenzie Methane investment, the prosecutor presented testimony showing only that the trustees requested and were advised about the ethical propriety of investing in projects related to the Estate's investments in McKenzie Methane; that it might be a breach of trust for a trustee to invest in an investment related to the Estate's investment; and that Peters had invested in McKenzie Methane. The limited testimony the State elicited from Aipa left the impression that Peters' investment in the McKenzie Methane matter was a breach of trust. The testimony at the hearing on the motion to dismiss, however, revealed that outside counsel opined the trustees and the employees of the Estate were not ethically prohibited from investing in another McKenzie Methane investment and the trustees and employees, including Peters, complied with the legal advice they received from outside counsel. In short, Aipa's less than complete grand jury testimony regarding McKenzie Methane wrongfully implied that Peters had breached his fiduciary responsibility then and was in breach of trust again in the matter before the grand jury. Leaving the grand jury with such a misleading inference "undermined the fundamental fairness and integrity of the grand jury process" and prevented the grand jury "from the exercise of fairness and impartiality" with regard to Peters that due process demands. *State v. Chong,* 86 Hawai'i 282, 284, 949 P.2d 122, 124 (1997). [9]

**\*\*926 \*524** D. *The State improperly limited Okada's testimony before the grand jury*

The State contends the circuit court erred when it concluded the State withheld clearly exculpatory evidence from the grand jury. The State argues the testimony Glenn Okada was prevented from giving was not clearly exculpatory. We disagree.

As noted previously, the perjury charge against Stone was premised upon testimony Stone gave before a prior grand jury about being contacted by Okada with regard to contacting Peters about the availability of an upper floor unit in Peters' building. Before the grand jury, the State questioned Glenn Okada, as follows:

> [Prosecutor]: ... Now, did you know that Henry Peters moved from apartment 202 to apartment 1203 some time in January 1996?
>
> [Okada]: I found out later that he had bought it.
>
> [Prosecutor]: Okay. Now, prior to Mr. Peters making a move, did you ever talk to him about him possibly making that move from 202 to 1203?
>
> [Okada]: Well, he—yeah, he was interested in buying another unit, upper floor unit early on but, you know, I'm kind of semi-retired so I never really pursued it. I looked at that unit and I can't recall whether it was Brenda Bagano or Jeff Stone that told me about the unit 'cause they know that I was buying some distressed properties, so—in my pension plan—so I looked at the unit but the owner, the Japanese owner never lived in the unit and we had water damage on the top floor of all the units, including my unit, which the contractor and subcontractors had to repair, and that unit 1203, when I looked at it, it had—it had quite a bit of water damage so the wallpapers, the carpet which was a very expensive carpet that we had in the units itself was—was—had to be all replaced and the unit, since it never had been lived in, the appliances, you know, had no warranty anymore, so—
>
> [Prosecutor]: Okay, Mr. Okada, let me ask you just so that we're clear. The first time that you heard about Henry Peters moving from 12—from 202 to 1203, how did you find out?
>
> [Okada]: Well, I think Jeff Stone may have mentioned that to me at one of our luncheons.
>
> [Prosecutor]: Okay. And as far as you ever talking to Mr. Peters about moving from 202 to 1203, did that ever happen?
>
> [Okada]: He may have mentioned that he was looking at the apartment and I may have mentioned to him that I had looked at the apartment and saw that it was, yeah, had a lot of damage in the apartment.
>
> [Prosecutor]: All right. Now, Mr. Okada, do you remember testifying before the grand jury on October—excuse me—on November 25, 1998?
>
> [Okada]: Yeah.
>
> [Prosecutor]: Okay. And that was similar to the kind of arrangement today, in other words, you were called in and you were sworn under oath?
>
> [Okada]: Yeah.
>
> [Prosecutor]: Okay. And questions were asked of you?
>
> [Okada]: Yes.
>
> [Prosecutor]: Now, do you remember being asked these questions and you giving these answers?
>
> The question started off, "Just so that we're clear and there isn't any confusion, the only time that you apparently heard about Peters buying into apartment 1203 was when Jeffrey Stone may have told you about it?"
>
> And your answer was, "Yeah."
>
> [Okada]: Yeah.
>
> [Prosecutor]: Wasn't that your answer?
>
> [Okada]: Yeah.
>
> **927 *525 [Prosecutor]: And wasn't that the truth at the time?
>
> [Okada]: Well, I had—I had kind of forgotten about the looking at the apartment before until I had spoken to Brenda Bagano later and she reminded me that I looked at the unit.
>
> [Prosecutor]: All right. But in terms of when it was that you first heard about Henry Peters moving into

apartment 1203, that was when Jeffrey Stone told you about it, isn't that correct?

[Okada]: Yeah.

[Prosecutor]: And the next question was, "And you had nothing to do about telling him about apartment 1203?" And the answer was, "No?"

[Okada]: Yeah, I had forgotten about me—

[Prosecutor]: The answer was, "no?"

[Okada]: Yeah. Well, at that—I couldn't recall.

[Prosecutor]: Mr. Okada, the answer was "no?"

[Okada]: Yeah.

[Prosecutor]: Okay. Thank you.

... And just so that we're clear, when you testified before the grand jury previously on November 25 about that last question, and you had nothing to do about telling him about apartment 1203, you were telling the truth at that time?

[Okada]: Yeah. I had forgotten about—

[Prosecutor]: Were you telling the truth at that time?

[Okada]: Yeah.

[Prosecutor]: Thank you....

At the hearing on the motion to dismiss, Okada testified about being questioned before the grand jury:

[Stone's counsel]: Now, Mr. Okada, you were called before the grand jury by [the prosecutor] on more than one occasion, correct?

[Okada]: Yes.

[Stone's counsel]: And the last time you were there, do you remember that you were trying to give an answer and you were interrupted?

[Okada]: Yes.

[Stone's counsel]: And it was [the prosecutor] who interrupted you?

[Okada]: Yes.

...

[Stone's counsel]: ... Do you remember when he interrupted you?

[Okada]: Yeah.

[Stone's counsel]: And you were trying to go back and tell him something, is that correct?

[Okada]: Yes.

...

[Stone's counsel]: Now again, we started here you've told us [the prosecutor] interrupted you during the grand jury and you started to tell him something. What was it that you would have told him if he would have let you finish?

[Okada]: That I had forgotten that I had looked at the unit. And what happened was that after I looked at the unit, I had lunch or I called Jeff Stone to tell him that I knew Henry was looking for an upper floor unit. From time to time, he and I would have lunch or meet Henry Peters; and he wanted to kind of get a pulse on the market from me, my perspective.

So in one of my meetings with him, he indicated to me that he was interested in getting an upper floor unit because his unit was on the second floor. So I forgot that I had mentioned—I had called Jeff or had lunch with him and mentioned to Jeff that Henry was looking for an upper floor unit and that if he would call Henry to see if he'd be interested in buying that upper floor unit.

And I called Henry to tell him that, well, I thought the unit would sell for about sixty to maybe eighty thousand dollars less than the true market value because of the damage, the water damages to the apartment which were not repaired, because the owner never made any attempt to claim the damage.

...

**928 *526 [Stone's counsel]: Now, is that what you would have testified to in substance if [the State's attorney] had not interrupted you?

[Okada]: Yeah.

[Stone's counsel]: And here now today under oath, just so we're clear, you were the one who called Jeff Stone and told Mr. Stone to call Mr. Peters about Unit 1203?

[Okada]: Yeah.

The State argues, in sum, the testimony that Okada was prevented from giving was not clearly exculpatory and the State had no obligation to present it. The State opines Okada's testimony was, at best, contradictory. The State argues the circuit court's finding that Okada was prevented from giving clearly exculpatory evidence was the kind of speculation that other courts have found to be undue interference with the grand jury process. We disagree with the State's arguments.

[11] This court has rejected an approach to claims of prosecutorial misconduct that would require the prosecutor to put before the grand jury "any and all evidence [that] might tend to exculpate the defendant," *Bell,* 60 Haw. at 243, 589 P.2d at 519, or that would merely tend "to negate guilt," *Id.* at 247, 589 P.2d at 521, and has concluded a court should dismiss an indictment only when the prosecutor failed to present evidence that "clearly would have negated guilt" or presented evidence that would "undermine[ ] the authority of the grand jury to act at all[.]" *Id.* at 247, 589 P.2d at 521 (quoting *United States v. Mandel,* 415 F.Supp. 1033, 1041–2 (D. Maryland 1976)).

In this case, unlike *Bell,* one witness could provide the evidence concerning whether Stone lied when Stone testified that Okada contacted Stone and told Stone to contact Peters about the possibility of buying apartment 1203. The prosecutor put that witness, Okada, before the grand jury and asked him about when Okada heard about Peters "moving" and "buying" apartment 1203. The prosecutor did not allow Okada to testify about his role in making the availability of apartment 1203 known to Stone and Peters. Okada's testimony would have been the only direct testimony on the subject, it was not in contradiction of Okada's testimony about "moving" and "buying," and it would clearly have negated guilt.

The circuit court did not err when it dismissed the perjury count of the indictment.

E. *Remedy*

[12] [13] [14] We are mindful that dismissal of an indictment is required only in flagrant cases in which the grand jury has been overreached or deceived in some significant way. *State v. Mendonca,* 68 Haw. 280, 283, 711 P.2d 731, 734 (1985); *State v. Pulawa,* 62 Haw. 209, 215–16, 614 P.2d 373, 377–78 (1980). The State, citing *State v. Scotland,* 58 Haw. 474, 572 P.2d 497 (1977) and other cases, argues that if we conclude there was prosecutorial misconduct, the appropriate remedy would be suppression of the evidence, not dismissal of the indictment. We disagree. We have concluded the privileged and bolstered testimony presented by the State and the exculpatory testimony omitted by the State prevented the grand jury from acting fairly and impartially. *See Chong, supra,* quoting *Bell, supra.* "If the illegal or improper testimony clearly appears to have improperly influenced the grand jurors despite the presence of sufficient evidence amounting to probable cause to indict the defendant, [10] [the defendant] would be entitled to a dismissal." *Scotland,* 58 Haw. at 477, 572 P.2d at 499. "Where a defendant's substantial constitutional right to a fair and impartial grand jury proceeding is prejudiced, a quashing of the indictment emanating therefrom is an appropriate remedy." *State v. Joao,* 53 Haw. 226, 230, 491 P.2d 1089, 1092 (1971).

[15] In *State v. Moriwake,* 65 Haw. 47, 647 P.2d 705 (1982) this court held that a trial court's power to administer justice may be properly invoked to dismiss an indictment with prejudice. Our duty to administer justice requires that we invoke that authority **929 *527 here to mandate dismissal of these indictments with prejudice. As the *Moriwake* court noted:

[W]e are cognizant of the deference to be accorded the prosecuting attorney with regard to criminal proceedings, but such deference is not without bounds. As stated elsewhere:

Society has a strong interest in punishing criminal conduct. But society also has an interest in protecting the integrity of the judicial process and in ensuring fairness to defendants in judicial proceedings. Where those fundamental interests are threatened, the "discretion" of the prosecutor must be subject to the power and responsibility of the court.

*State v. Braunsdorf,* 98 Wis.2d 569, 297 N.W.2d 808, 817 (1980) (Day, J., dissenting).

*State v. Moriwake,* 65 Haw. 47, 56, 647 P.2d 705, 712 (1982). In *State v. Alvey,* 67 Haw. 49, 57–58, 678 P.2d 5, 10 (1984), this court noted that a judge's inherent power to **dismiss** an **indictment** is not generally so broad as to **dismiss** an **indictment** with prejudice before trial unless the **State's** misconduct represents a serious threat to the integrity of the judicial process or there is a clear denial of due process, a **violation** of some constitutional right, is an arbitrary action, or is the result of some other governmental misconduct. In *Moriwake, supra,* and in *Alvey, supra,* this court

> cautioned that a trial court's inherent power to **dismiss** an **indictment** is not a broad power and that trial courts must recognize and weigh the **State's** interest in prosecuting crime against fundamental fairness to the defendant ... [and] made clear that, even if "there are serious questions" about a material element of a crime, it is not within the trial court's discretion to usurp the function of the trier of fact before trial.

*State v. Lincoln,* 72 Haw. 480, 825 P.2d 64, 70–71(1992). We are cognizant of the **State's** strong interest in prosecuting crime, but we are equally cognizant that the **State's** duty is to pursue justice, not convictions, and the **prosecutor** has a duty to act as a minister of justice to pursue prosecutions by fair means. We must weigh the **State's** interests against the defendants' rights to fundamental fairness, including an unbiased grand jury. In doing so, we cannot but conclude that the **State's** actions in these cases threatened the integrity of the judicial process and denied the defendants the process they were due. The **State** acted here in complete disregard of the **attorney-client privilege** and the rules of evidence. In doing so, the **State** deprived the defendants of a timely opportunity to raise the **attorney-client privilege** issue and to seek a preliminary judicial determination of it. In addition, the **State** improperly bolstered the testimony of a witness by wrongly presenting the testimony as **privileged** testimony within the crime fraud exception to the **attorney client privilege**, and prohibited a witness from presenting clearly exculpatory evidence. The **State's** actions cannot but have improperly influenced the grand jury and prevented it from operating with fairness and impartiality. The **State's** actions here, some of which were taken in contravention of the circuit court's clear instructions to seek preliminary judicial review, represent a serious threat to the integrity of the judicial process and merit **dismissal** with prejudice.

We take notice that these defendants have been charged with serious crimes several times. In each instance the **indictments** have been **dismissed** due to **prosecutorial** misconduct. In a dissent in *United States v. Williams,* 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992), United **States** Supreme Court Associate Justice John Paul Stevens discussed the dangers of misconduct by a United **States** Attorney. His discussion on the subject is applicable to misconduct by any prosecuting attorney:

> Justice Sutherland's identification of the basic reason why [**prosecutorial**] ... misconduct is intolerable merits repetition:
>
> "The [**prosecutor**] ... is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and **\*\*930 \*528** very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States,* 295 U.S.[78], at 88, 55 S.Ct. at [629,] 633 [79 L.Ed. 1314].
>
> It is equally clear that the **prosecutor** has the same duty to refrain from improper methods calculated to produce a wrongful **indictment**. Indeed, the **prosecutor's** duty to protect the fundamental fairness of judicial proceedings assumes special importance when he is presenting evidence to a grand jury. As the Court of Appeals for the Third Circuit recognized, "the costs of continued unchecked

State v. Wong, 97 Hawai'i 512 (2002)
40 P.3d 914
Case 4:18-cr-00339 Document 224-12 Filed on 01/26/22 in TXSD Page 16 of 18

prosecutorial misconduct" before the grand jury are particularly substantial because there

> "the prosecutor operates without the check of a judge or a trained legal adversary, and virtually immune from public scrutiny. The prosecutor's abuse of his special relationship to the grand jury poses an enormous risk to defendants as well. For while in theory a trial provides the defendant with a full opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo. Where the potential for abuse is so great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened." *United States v. Serubo,* 604 F.2d 807, 817 (1979).

*United States v. Williams,* 504 U.S. 36, 62–3, 112 S.Ct. 1735, 1750, 118 L.Ed.2d 352 (1992) (Stevens, J. dissenting).

The State's interest in prosecuting these cases is, at this point, clearly outweighed by the lack of fundamental fairness that would ensue were we to allow these prosecutions to continue.

IV. *Conclusion*

The circuit court's orders of dismissal are affirmed. The circuit court's orders that the dismissals are without prejudice are vacated and these cases are remanded to the circuit court with instructions to enter the dismissals with prejudice.

**All Citations**

97 Hawai'i 512, 40 P.3d 914

**Footnotes**

| | |
|---|---|
| 1 | The record contains information that both OKP and the Estate reaped considerable benefit from the transaction. OKP was estimated to have reaped a nine million dollar profit. Rather than having to deal with a bankrupt developer, the Estate apparently received the expectations from its original agreement with Kapalele Associates, plus significantly increased annual payments at a higher rate of interest, immediate rights to some of the money generated from the sale of condominium units, and, among other things, additional security in the form of mortgages and partner guarantees that provided recourse in the event of OKP's default. |
| 2 | Frunzi was allowed to resign from the practice of law in lieu of discipline on April 10, 1997. *See* Supreme Court Case Number 20583, *Office of Disciplinary Counsel v. Richard L. Frunzi.* A resignation in lieu of discipline is a disbarment. RSCH 2.14(d). Frunzi testified before the grand jury on January 14, 1999. |
| 3 | The State also subpoenaed Stone attorneys James Stubenberg and Jonathan Durrett. Stubenberg and Durrett raised privilege issues on Stone's behalf and the parties sought and obtained a court ruling concerning the extent to which Stubenberg and Durrett could testify. |
| 4 | In *State v. Joao,* the State introduced a grand jury witness as "the original defendant charged with murder" who "decided to make a clean breast." 53 Haw. at 227, 491 P.2d at 1090. This court held that the prosecutor's conduct was contrary to the fundamental principles of liberty and justice that lie at the base of all our civil and political institutions and affirmed the circuit court's dismissal of the indictment. 53 Haw. at 230, 491 P.2d at 1091–2. |
| 5 | **Rule 503. Lawyer-client privilege.** (a) Definitions. As used in this rule:<br>(1) A "client" is a person, public officer, or corporation, association, or other organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services.<br>(2) A "representative of the client" is one having authority to obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the client. |

(3) A "lawyer" is a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation.

(4) A "representative of the lawyer" is one directed by the lawyer to assist in the rendition of professional legal services.

(5) A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure would be in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication.

(b) General rule of privilege. A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the lawyer or the lawyer's representative, or (2) between the lawyer and the lawyer's representative, or (3) by the client or the client's representative or the lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest, or (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.

(c) Who may claim the privilege. The privilege may be claimed by the client, the client's guardian or conservator, the personal representative of a deceased client, or the successor, trustee, or similar representative of a corporation, association, or other organization, whether or not in existence. The person who was the lawyer or the lawyer's representative at the time of the communication shall claim the privilege on behalf of the client unless expressly released by the client.

(d) Exceptions. There is no privilege under this rule:

(1) Furtherance of crime or fraud. If the services of the lawyer were sought, obtained, or used to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud;

(2) Prevention of crime or fraud. As to a communication reflecting the client's intent to commit a criminal or fraudulent act that the lawyer reasonably believes is likely to result in death or substantial bodily harm, or in substantial injury to the financial interests or property of another;

(3) Claimants through same deceased client. As to a communication relevant to an issue between parties who claim through the same deceased client, regardless of whether the claims are by testate or intestate succession or by inter vivos transaction;

(4) Breach of duty by lawyer or client. As to a communication relevant to an issue of breach of duty by the lawyer to the client or by the client to the lawyer;

(5) Document attested by lawyer. As to a communication relevant to an issue concerning an attested document to which the lawyer is an attesting witness;

(6) Joint clients. As to a communication relevant to a matter of common interest between two or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between any of the clients; or

(7) Lawyer's professional responsibility. As to a communication the disclosure of which is required or authorized by the Hawai'i rules of professional conduct for attorneys.

6   We recognize that some of the opinions cited in the lengthy list were filed after the State of Hawai'i presented its evidence to the grand juries in the actions covered by these appeals. We list them only to note the wealth of authority available on the subject of attorney-client privilege and the burden of seeking exception to it. The list could have been much longer.

7   We are aware that legitimate law enforcement may require that witnesses be questioned in confidence. When an issue of privilege is involved, each such case must be judged on its own merits to determine whether a judicial determination of privilege without the presence and argument of the person entitled to claim the privilege will meet the requirements of due process. At minimum, in the absence of an opportunity for the holder of the privilege to raise the issue or in the face of a faithless lawyer failing to raise the issue before a court of competent jurisdiction, the prosecutor must seek a court ruling on the privilege issue.

8   We have reviewed Frunzi's testimony and conclude that most of it was **privileged** and none of the **privileged** testimony was subject to the crime-fraud exception to the **attorney**-**client** **privilege**. In the circumstances of this case, we see no need to burden this opinion or to further breach the **privilege** with a lengthy exegesis on the subject.

9   Having reviewed Aipa's testimony, it is apparent that much of Aipa's testimony concerned advice and consultation with the Estate trustees, including Peters, about the trustees' legal duties. The **State's** own characterization of Aipa's testimony belies its conclusion that Aipa's testimony was not **privileged**. The **State** says Aipa was called "[t]o provide the grand jury with more specific information from which to determine Peters knew that any benefit he received from a transaction in which the trust was also involved needed to be returned to the trust [.]" The "specific information" was, according to Aipa's testimony, the legal advice that was sought and rendered by outside counsel. In short, Aipa testified about "the aid of persons having knowledge of the law and skilled in its practice," *see e.g.* Zolin, 491 U.S. at 562, 109 S.Ct. at 2625, and that, by any definition, is legal advice. The **State** argues the **attorney**-**client** **privilege** belonged to the Estate, not Peters.

We disagree, but see no reason to reach this issue of first impression for Hawai'i in this case. *Cf.* Huie v. DeShazo, 922 S.W.2d 920 (Tex.1996) (Texas Supreme Court concluded "the trustee who retains an attorney to advise him or her in administering the trust is the real client, not the trust beneficiaries.") "Client" in the Texas evidence code is defined exactly as it is in the Hawai'i Rules of Evidence and Hawai'i trustees, like those of Texas, are empowered to hire and consult attorneys and to act on the attorneys' advice. *See* HRS § 554A–3(c)(23) (Supp.2000) and Riggs National Bank v. Zimmer, 355 A.2d 709 (Del.Ch.1976) (Delaware supreme court concluded that in litigation between trust beneficiaries and trustees, the **attorney**-**client** **privilege** did not bar discovery because the legal counsel was sought to aid the beneficiaries).

10  Given our disposition of this appeal, we make no judgment about probable cause.

---

**End of Document**   © 2022 Thomson Reuters. No claim to original U.S. Government Works.