UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No. 4:18-CR-339 |
| | § | |
| CLINT CARR and | § | |
| FRASIEL HUGHEY, | § | |
| | § | |
| Defendants. | § | |

### UNITED STATES' REPLY IN SUPPORT OF
### OPPOSED MOTION FOR AUTHORIZATION TO RELEASE RECORDS

The United States of America, by and through its assigned Filter Team, respectfully submits this Reply in support of its Motion for Authorization to Release to the Prosecution Team 270,378 records (the "Records") not subject to a valid privilege assertion (Docket Entry No. 209).

The Motion should be granted because no party has done more than provide a blanket assertion of privilege over the Records despite receiving them more than a year-and-a-half ago in June 2020. Even after this Court granted the Filter Team's prior motion to release telephone recordings involving CC Pharmacy's[1] attorney, no one, including Carr, moved for reconsideration of that Order or appealed the ruling. Now, two months later, Carr demands the Court reconsider its prior Order. It is the privilege holder's burden, not the Government's, to zealously protect privilege by identifying the particular documents over which it purports to claim privilege, and then providing specific descriptions of those assertions in the form of a privilege log. *See United*

---

[1] "CC Pharmacy" refers to CC Pharmacy, LLC, and its affiliate companies, CC Pharmacy 2, LLC and CC Pharmacy 3, LLC. These entities were all owned by Defendant Carr and were dissolved and defunct under the laws of the State of Texas.

*States v. Kelly*, 569 F.2d 928, 938 (5th Cir. 1978) (The party "which claims the privilege, bears the burden of establishing the requisite determinants."). Carr has not done so.[2]

Even had Carr attempted to assert CC Pharmacy's privilege, by Defendant's own concession, CC Pharmacy no longer exists. No one—including the former company's principals or officers—may assert privilege on behalf of a dead company they no longer control.[3] Defendant Carr's briefs[4] mischaracterize the core issue here as one of "***involuntary 'waiver'***" instigated by the Government (Opp. at 12), but this argument misses the mark on both accounts: (1) there is no "***waiver***"; instead, courts consistently hold that a dead company's privilege simply ceases to exist, and that the defunct company—not the Government—bears the burden of showing good cause and legal authority for why its expired privilege should survive;[5] and (2) CC Pharmacy's dissolution was not "***involuntarily***" caused by the Government's investigation or indictment of its principals and employees. Instead, the company was dissolved by State of Texas agencies due to its failure to take basic administrate steps to ensure its continued existence.

Moreover, the company was capable of—and did—continue operations following the execution of November 2017 search warrants discussed in the Supplemental Opposition, but later neglected to take basic actions like renewing its pharmacy licenses leading up to the June 19, 2018 Indictment. In any case, courts routinely conclude that companies lose privilege interests when they have gone defunct following indictment or investigation, and Defendant Carr has not provided

---

[2] Further, the vast majority of the Records (approximately 269,000 of the 270,000 or ***99.6%*** of the Records) do not appear to contain any parties' Potentially Protected Material, including CC Pharmacy's. *See infra* n.6.
[3] *See United States v. Cox*, No. 8:14-CR-0140-T-23MAP, 2015 WL 13741738, at *4 (M.D. Fla. Oct. 7, 2015), *report and recommendation adopted sub nom. United States v. Biddix*, No. 8:14-CR-140-T-23MAP, 2015 WL 9473949 (M.D. Fla. Dec. 29, 2015) (denying defunct company's motion to intervene to assert privilege, finding "[s]imply, there is no longer a viable corporate client to assert the privilege").
[4] Opposition to the Motion (Docket Entry No. 215) and Supplemental Opposition (Docket Entry No. 222).
[5] *See Gilliland v. Geramita*, No. 2:05CV01059, 2006 WL 2642525, at *4 (W.D. Pa. Sept. 14, 2006) ("The better rule, in the Court's view, is that there should be a presumption that the attorney-client privilege is no longer viable after a corporate entity ceases to function, unless a party seeking to establish the privilege demonstrates authority and good cause.").

a single case supporting his theory that this Court should find otherwise. For these reasons, the Filter Team respectfully requests that the Court grant its Motion.

**I. CC PHARMACY HAS NOT TIMELY OR SUFFICIENTLY ASSERTED PRIVILEGE**

CC Pharmacy has not met its burden of providing specific privilege assertions, despite having access to the documents for a year-and-a-half, and the Court entering an Order authorizing the release of telephone recordings involving CC Pharmacy's attorney (Docket Entry No. 170). In particular, the Filter Team produced all but eighteen of the Records to Defendants on June 4, 2020. To date, no party has provided specific privilege assertions over these documents, nor furnished a privilege log. Defendant Carr's Opposition and Supplement suggest he was not aware he was required to specifically assert privilege or furnish through a privilege log, and that it was the *Government's* obligation to ensure he complied with his privilege obligations. Opp. (Docket Entry No. 215) at 2, Supp. Opp. (Docket Entry No. 222) at 5. Precisely the opposite. Putative privilege holders alone bear the burden of asserting their privilege assertions with specificity. *See Kelly*, 569 F.2d at 938; *United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982) (finding corporate documents subject to production because company "failed to meet its burden to assert the privilege specifically"); *see also EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 697 (5th Cir. 2017) (privilege logs must articulate "specific facts that, if credited, would suffice to establish each element of the privilege or immunity that is claimed").

Defendant Carr tries to simply make a blanket privilege "objection" on behalf of CC Pharmacy over the Records without explaining the basis for a purported privilege. Courts consistently reject such blanket privilege claims. *See El Paso Co.*, 682 F.2d at 541 (5th Cir. 1982) (discussing "the unacceptability of blanket assertions of the attorney-client privilege") (citing

*United States v. Davis*, 636 F.2d 1028, 1044 (5th Cir. 1981) ("Blanket assertions of privilege before a district court are usually unacceptable.")).[6]

Defendants were well aware that the Filter Team was seeking the Court's determination of CC Pharmacy's lapsed corporate privilege, as raised in the prior Motion to Authorize Release of Four Telephone Recordings (Docket Entry No. 168), which the Court granted in November 2021 (Docket Entry No. 169). As advised in that motion—as well as the instant Motion, consistent with CrLR 12.2, the Filter Team conferred with counsel for Defendants regarding its request, and as noted in the Motion, Defendant Carr stated that he objected to the release.[7] Now, nearly three months after the Court entered its November 2, 2021 Order, no party purporting to act on CC Pharmacy's behalf has taken any action to either actually assert the Company's privilege, or pursue a motion to reconsider what Defendant Carr now claims was an inappropriate ruling.[8] To the extent the company did maintain a discernible privilege interest over the recordings or the Records—and it did not—it has taken no action to protect those interests other than the unspecified blanket "objection" Defendant Carr now raises in his briefs.

---

[6] Even if this blanket privilege assertion were sufficient (and it is not), it is facially implausible. Based upon the Filter Team's limited review, the vast majority of the Records do not appear to contain even arguably Potentially Protected Material. Metadata searches reflect that roughly 1,000 of the 270,000 Records—or ***approximately .03% of the Records***—contained communications with individuals identified as CC Pharmacy's outside legal personnel, including (1) Joel Rheman, Esq. of Sullins, Johnston, Rohrbach & Mangers; (2) Karen Van Holten, Esq. and Briana Collipp, paralegal of Van Holten Law Firm, PLLC; (3) Robyn Howell, paralegal from Law Offices of Joel A. Nass; (4) Carol Cantrell, Esq. of Cantrell & Cantrell PLLC; (5) Don Lewis, Esq.; and (6) Michael Wynne, Esq. The Filter Team did not identify any other individuals' Potentially Protected Material or any other attorney communications in the Records, the remainder of which largely appears to be photo and video files.

[7] The November 1, 2021 Motion to Authorize Release of Four Telephone Recordings (Docket Entry No. 168) was not captioned as unopposed, despite Defendant Carr's suggestion otherwise.

[8] The Filter Team still has not received any privilege log or other specific privilege assertion over the recordings authorized to be released pursuant to the Court's November 2, 2021 Order (Docket Entry No. 170). Out of an abundance of caution, following the entry of the Court's November 2, 2021 Order (*id.*), the Filter Team waited a period of 14 days before releasing the four recordings to the Prosecution Team, but no party sought reconsideration of the Court's ruling, and it then released these recordings on November 16, 2021.

**II. THE INDICTMENT DID NOT CAUSE CC PHARMACY'S DEMISE AND NO AUTHORITY SUPPORTS DEFENDANT'S THEORY THAT POST-INDICTMENT DISSOLUTION DOES NOT NEGATE PRIVILEGE**

    **A.    The Indictment Did Not Cause the Involuntary Dissolution of the Company—Defendants' Knowingly Abandoned It Even Pre-Indictment.**

Defendant Carr suggests that the Government is pursuing a doctrine of "involuntary waiver" to obtain CC Pharmacy's privileged material. Not so. *First,* this matter does not involve privilege waiver in any sense. Instead, courts consistently have found that when a company is defunct, the privilege simply expires along with the company itself. *See, e.g.*, *TAS Distrib. Co. v. Cummins Inc.*, No. 07-1141, 2009 WL 3255297, at *2 (C.D. Ill. Oct. 7, 2009) ("No real purpose would be served by continuing the privilege after operations cease, as the corporation would no longer have any goodwill or reputation to maintain."). In other words, dissolution does not cause a privilege *waiver*—a dead company can neither issue a privilege waiver nor assertion; the privilege simply withers on the vine along with the company, as no individual has authority to speak on behalf of a non-existent company. *Cox*, 2015 WL 13741738, at *4 (noting that defunct company no longer exists to assert privilege).

Critically, it is the ***defunct company's burden***, not the Government's, to establish that good cause and authority supports the resurrection of its corporate privilege. *See Gilliland v. Geramita*, No. 2:05CV01059, 2006 WL 2642525, at *4 (W.D. Pa. Sept. 14, 2006) ("The better rule, in the Court's view, is that there should be a presumption that the attorney-client privilege is no longer viable after a corporate entity ceases to function, unless a party seeking to establish the privilege demonstrates authority and good cause."). Here, by Defendant Carr's own concession, CC Pharmacy is defunct and its corporate registration was forfeited in October 2018. He offers no legal basis or good cause for why his defunct company's privilege should be revived after three-and-a-half years, even while the company itself remains dead.

5

This is consistent with the narrow interpretation of privilege protections—the underlying policy of a corporate attorney-client protections does not support its existence here. As the Fifth Circuit has recognized, "because the privilege is 'an obstacle to truthseeking,' it must 'be construed narrowly to effectuate necessary consultation between legal advisors and clients.'" *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001) (quoting *In re LTV Sec. Litig.*, 89 F.R.D. 595, 606 (N.D. Tex. 1981)).[9] "Attorney-client privilege goes only as far as the policy interests supporting the rule require. Once a corporation becomes defunct, the policy interests supporting shielded communications fall away." *United States v. Cole*, No. 1:20-CR-424, 2021 WL 5027215, at *3 (N.D. Ohio Oct. 29, 2021).

*Second*, CC Pharmacy's dissolution was not "involuntarily" caused by the Government, but by the company failing to take even basic steps to continue operations. Defendant Carr has put forth no evidence showing that the company took any steps to maintain or revive its corporate existence following its dissolution. To be clear, the company itself was not indicted. And to the extent it had legitimate operations it wished to continue following the individuals' indictment in this matter, it was legally entitled to do so, but did not choose to do so.

Further, the events resulting in the company's ultimate dissolution were within the company's control. CC Pharmacy could easily have maintained its existence, along with its corporate privilege, by completing ministerial filings and paying the required franchise taxes and fees. It opted not to do so and as a result, the Texas Comptroller of Public Accounts "involuntarily

---

[9] *See also United States v. Robinson*, 121 F.3d 971, 975 (5th Cir. 1997) ("[T]he privilege is to be construed narrowly to apply only where its application would serve its purposes . . . ."); *City of Rialto v. U.S. Dept. of Defense*, 492 F. Supp. 2d 1193, 1197 (C.D. Cal. 2007) ("Moreover, because the attorney-client privilege has the effect of withholding relevant information from the factfinder, it should be applied only when necessary to achieve its limited purpose of encouraging full and frank disclosure by the client to his or her attorney.").

ended"[10] the company's right to transact business (Mot. (Docket Entry No. 209), Ex. A), and the Texas Secretary of State deemed CC Pharmacy's charters forfeited and terminated the company's rights to conduct business (*id.*). CC Pharmacy did not file any records to revive its registrations or submit any further filings with the State of Texas following its dissolution. *See id.* The company alone is responsible for allowing its corporate form to lapse and then failing to take even basic administrative steps to revive it.

Moreover, Defendant Carr argues that the scope of the Government's seizures pursuant to the November 2017 search warrants made CC Pharmacy's continued operation impossible—even the ministerial tasks described above. Supp. Opp. (Docket Entry No. 215) at 2-3. Not so. The Government's search warrants covered only seizure related to <u>controlled substances</u> being illegally distributed by CC Pharmacy, yet the company also had the capability of distributing <u>non-controlled substances</u>—which the Government understands CC Pharmacy had begun doing after August 2017. These non-controlled substances were not covered by the scope of the search warrants and were left unseized. Similarly, execution of the search warrants did not restrict CC Pharmacy from accessing any materials it stored in the cloud. Once more, if CC Pharmacy wished to engage in legitimate business operations post-search warrant, it was able to do so.

Other records also demonstrate that CC Pharmacy continued other operations following the November 2017 search warrants. For instance, Defendants sold CC Pharmacy 3, LLC to a new buyer in March 2019, prior to which Defendant Carr paid the outstanding office rent and obtained premises keys to facilitate this sale. *See* Ex. 1 (CC Pharmacy 3, LLC Certificate of Amendment); Ex. 2 (May 15, 2018 DEA Report of Investigation). CC Pharmacy 3, LLC was then

---

[10] The offices of the Texas Comptroller of Public Accounts and the Texas Secretary of State were far more directly involved in the company's dissolution, as these agencies actually suspended and terminated the company from operations. Once more, however, these agencies' actions were as a result of Defendants' failure to maintain CC Pharmacy's obligations.

briefly reinstated in 2019 by new owners, but they subsequently forfeited the business in 2020. *See* Ex. 3 (Application for Reinstatement and to Set Aside Forfeiture); Mot. (Docket Entry No. 209), Ex. A. Further, text message communications between Defendant Carr and co-defendant Dustin Curry show continued business operations post-November 15, 2017 and post-Indictment. *See* Ex. 4 (text message communications between Defendants Carr and Curry).[11]

Further, neither the federal Drug Enforcement Administration nor the State of Texas unilaterally revoked the company's pharmacy licenses and registrations when search warrants were executed in November 2017. Instead, the company let the pharmacy licenses expire and Defendant Carr voluntarily surrendered CC Pharmacy and CC Pharmacy 2's DEA registrations on June 15, 2018, prior to the Indictment. *See* Ex. 5 (Voluntary Surrender of Controlled Substance Privileges).[12]

Accordingly, Defendant Carr provides no evidence that the individual Defendants' indictment caused CC Pharmacy's dissolution. In reality, it was the direct result of Defendants' decisions to cease making corporate filings, remitting state taxes, and maintaining active pharmacy licenses.

---

[11] Exhibit 4 contains text messages between Carr and co-defendant Curry from July 20-23, 2018. Carr's messages are on the left; Curry's are on the right. On July 21, Carr texts Curry a photo of CC Pharmacy 2's inventory and then indicates there are "8,063 total bottles" of drugs left at CC Pharmacy 2. Page 2 of Exhibit 4 contains a screenshot that Carr sends to Curry of a text message from a person named "Waylon." In the screenshot-message, Waylon tells Carr "Clint, I have a lady named Tonya calling asking for a spreadsheet of all the scripts we've filled for Kelechi , as well as called to tell me that 4 of the patients we received scripts for are no longer participating in the program." Exhibit 4 confirms that they still had valuable inventory and were discussing filling prescriptions post Indictment.

[12] DEA was pursuing Orders to Show Cause for CC Pharmacy, LLC and CC Pharmacy 2, LLC that would have revoked their registrations, but Carr's voluntary surrender mooted that effort.

### B. Corporate Privilege Is Extinguished When Dissolution Follows Indictment and Investigation of Company Principals and Officers.

Defendant Carr does not provide a single case supporting his novel theory that suspected criminal companies that go out of business following an investigation into that criminal activity should be carved out from the general rule that defunct companies possess no privilege interests.

In reality, courts have concluded that companies that go defunct following the commencement of criminal or enforcement investigation indeed surrender their privilege interests. For instance, in *United States v. Cole*, No. 1:20-CR-424, 2021 WL 5027215, at *3–4 (N.D. Ohio Oct. 29, 2021), the U.S. Department of State issued a cease-and-desist order requiring the company "to immediately cease engaging in intercountry adoptions." Thereafter, the company entered into a consent decree, and it was forced to wind down operations and dissolve. *Id.* at *1. The *Cole* court concluded that the company had surrendered its privilege interests as a result of its dissolution and cessation of operations, as caused by the government. *Id.* at *4 ("European Adoption Consultants is defunct and as a result, the corporation can no longer claim attorney-client privilege."). In *Cole*, a government agency was directly responsible for shutting down a business and forcing its dissolution; yet the court still concluded that the company had forfeited its privilege protections.[13]

Similarly, *United States v. Walters*, No. 2:19-CR-51-KS-MTP, 2020 WL 1934803, at *2 (S.D. Miss. Apr. 21, 2020), dealt with the corporate dissolution of two entities—one of which was dissolved in November 2019, three months post-indictment, while the other was dissolved several

---

[13] Courts likewise conclude that former management may not assert privilege where the government has unilaterally forced companies to wind down operations through appointed receivers or to liquidate through bankruptcy trustees. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985) (former management of company does not control privilege where consent decree provided for the appointment of a receiver to liquidate the company under Chapter 7 of the bankruptcy code); *SEC v. Bravata*, 2011 WL 606745 (E.D. Mich. Feb. 11, 2011) (former management unable to assert privilege where court-appointed receiver controlled winding down company); *see also SEC v Ryan*, 747 F. Supp. 2d 355, 361-62 (N.D.N.Y. 2010) (same).

9


years prior, in April 2015. The fact that one entity ceased operations post-indictment, while the other pre-indictment had no bearing on the court's conclusion that the entities possessed no valid privilege interests. *See id.* at *2 (finding that it is undisputed neither entity "conducts any business. . . . The Court finds that these entities have ceased to function for purposes of determining whether the attorney-client privilege is viable."); *Cf.* Opp. at 6 (claiming that in *Walters* "articles of dissolution were filed on one of the relevant entities ***five years prior*** to the assertion of the attorney-client privilege" while omitting reference to the other entity's post-indictment dissolution) (emphasis in original).

Here, unlike *Cole*, there is no such direct relationship between the instant indictment and CC Pharmacy's dissolution—but even if there were—the defunct company's privilege nevertheless expires. Same with *Walter*, the timing of the entities' dissolution with respect to indictment had no bearing on whether it had surrendered its corporate privilege. Once a company is defunct that is the end of the inquiry: the company's privilege dies with the company, and there is no bringing it back.

## CONCLUSION

For the foregoing reasons, and those set forth in the Motion, the United States of America, by and through its assigned Filter Team, respectfully requests authorization to release the Records to the Prosecution Team.

This the 27th day of January, 2022

                                              Respectfully submitted,

                                              JENNIFER B. LOWERY
                                              UNITED STATES ATTORNEY

                                              JOSEPH BEEMSTERBOER, ACTING CHIEF

            CRIMINAL DIVISION, FRAUD SECTION
            U.S. DEPARTMENT OF JUSTICE

By:  */s/ Timothy J. Coley*
    TIMOTHY J. COLEY
    District of Columbia Bar No. 997762
    Trial Attorney
    United States Department of Justice
    Criminal Division, Fraud Section
    Special Matters Unit
    1400 New York Avenue NW
    Washington, DC 20530
    Tel: (202) 514-0395
    Fax: (202) 514-3708
    Timothy.J.Coley@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on January 27, 2022, I filed the foregoing with the Clerk of the Court using the CM/ECF system.

*/s/ Timothy J. Coley*
TIMOTHY J. COLEY

Trial Attorney, Fraud Section

## CERTIFICATE OF CONFERENCE

I certify that on January 26, 2022, the government conferred with counsel for Defendant Carr, who remains opposed to the Motion.

*/s/ Timothy J. Coley*
TIMOTHY J. COLEY

Trial Attorney, Fraud Section